# EXHIBIT A
# 2020 Franchise Agreement

EX. A - 1



# FRANCHISE AGREEMENT

## MS0234

| | |
|---|---|
| Franchisor: | Mister Sparky Franchising, L.L.C., a Florida limited liability company |
| Full Legal Name of Franchisee: | Daniel Ferguson |
| Agreement Date: | December 10, 2020 |
| Approved Location: | TBD |

**TABLE OF CONTENTS**

Section                                                                                                                       Page

1.      DEFINITIONS ................................................................................................................. 1

2.      FRANCHISE GRANT AND TERRITORIAL PROTECTION.................................. 3

3.      AGREEMENT TERM ..................................................................................................... 5

4.      PRE-OPENING.............................................................................................................. 5

5.      TRAINING ..................................................................................................................... 6

6.      OPERATION OF THE FRANCHISED BUSINESS.................................................... 7

7.      FEES ............................................................................................................................. 11

8.      REPORTS, FINANCIAL STATEMENTS, CUSTOMER DATA, AND DATA SECURITY .................. 14

9.      INSURANCE ................................................................................................................ 17

10.     MARKETING AND ADVERTISING........................................................................... 17

11.     LICENSED MARKS AND COPYRIGHTS.................................................................. 20

12.     BRAND STANDARDS MANUALS ............................................................................ 21

13.     CONFIDENTIAL INFORMATION ............................................................................. 21

14.     RESTRICTIONS ON COMPETITION ........................................................................ 22

15.     SALE OR ASSIGNMENT............................................................................................ 23

16.     DEFAULT AND TERMINATION ............................................................................... 26

17.     OBLIGATIONS UPON TERMINATION OR EXPIRATION .................................... 30

18.     BUSINESS ENTITY REQUIREMENTS ..................................................................... 32

19.     RENEWAL ................................................................................................................... 32

20.     INDEMNIFICATION ................................................................................................... 34

21.     NOTICES ...................................................................................................................... 34

22.     GENERAL PROVISIONS............................................................................................ 34

23.     DISPUTES .................................................................................................................... 36

PERSONAL GUARANTEE AND SPOUSE ACKNOWLEDGMENT

APPENDIX A – DATA SHEET

APPENDIX B – BRAND APPENDIX

APPENDIX C – CONFIDENTIALITY AND NON-COMPETE AGREEMENT

APPENDIX D – TELEPHONE NUMBER AND INTERNET AGREEMENT

APPENDIX E – ELECTRONIC FUND TRANSFER AUTHORIZATION FORM

Mister Sparky - Franchise Agreement                                                                              May 2020
MS0234 – Daniel Ferguson

                                                                                                                              EX. A - 2

# FRANCHISE AGREEMENT

This Agreement is between the company identified as "Franchisor" on the cover page (**"we"**, **"us"** or **"Franchisor"**), and the individual or company identified as "Franchisee" on the cover page (**"you"** or **"Franchisee"**). If Franchisee is a company, the term **"Owners"** means the individual(s) identified on the Data Sheet as the owners of the Franchisee, plus any other individual(s) we may approve in the future to hold an interest in the Franchisee.

## 1.      DEFINITIONS

The terms defined in this Section 1 have the meanings set forth below. Other capitalized terms used in this Agreement are defined where they first appear within the text.

1.1.      **"Agreement Date"** means the Agreement Date shown on the cover page of this Agreement.

1.2.      **"Approved Location"** means the street address or specific site that we have approved for your business premises, as shown on the cover page of this Agreement. If the Approved Location has not been determined when we sign this Agreement, you are required to obtain our approval of a location within three (3) months after signing this Agreement. Once we approve the location, we will insert the street address or specific site on the cover page of this Agreement or otherwise confirm the approved address to you in writing.

1.3.      **"Brand"** means the brand identified on the cover page of this Agreement.

1.4.      **"Brand Appendix"** means Appendix B to this Agreement, which sets out certain business terms specific to the Brand.

1.5.      **"Brand Fund"** means the fund to which you will contribute to support development and recognition of the Brand, as more fully described in Section 10.2, and may be referred to by names other than the "Brand Fund."

1.6.      **"Brand Standards"** means our required and recommended specifications, standards, policies and procedures for products, services, image, and operations of Franchised Businesses.

1.7.      **"Brand Standards Manuals"** means, collectively, the materials and content we have developed relating to the establishment and operation of Franchised Businesses, consisting of one or more manuals, handbooks, and training materials regardless of format, including electronic files, video or audio recordings, and other media or otherwise communicated in writing to you, all of which we can modify, replace and supplement.  The Brand Standards Manuals are sometimes referred to as the "Operations Manuals."

1.8.      **"Confidential Information"** means all knowledge and data not generally known to the public, whether or not constituting trade secrets, that we disclose to you and/or the Owners or that you obtain by virtue of this Agreement or any activities under this Agreement, including but not limited to: (i) methods, techniques, specifications, standards, policies, procedures, and design and layout plans relating to the operation of Franchised Businesses; (ii) future marketing plans and promotional programs for the Brand; (iii) customer data and other information concerning consumer preferences; (iv) inventory requirements and specifications; (iv) sales, operating results, financial performance and other financial data of Franchised Businesses; (v) the contents of the Brand Standards Manuals and our training programs; (vi) vendor lists, terms of purchase, and other information concerning the selection and sourcing of products, services, technology,

1

Mister Sparky - Franchise Agreement                                                                    May 2020
MS0234 – Daniel Ferguson

equipment and supplies; (vii) marketing studies, surveys, and cost studies; (ix) research and development, test results, and feasibility studies; and (x) business plans and non-public financial information of or about us and our affiliates.

1.9.    **"Data Sheet"** means Appendix A to this Agreement, which collects certain details specific to Franchisee and this Agreement.

1.10.    **"Designated Vendor"** means a particular manufacturer, wholesaler, distributor or other source that we designate for particular products or services, which may be a third party, us, or our affiliate.

1.11.    **"Equipment Package"** means the list of equipment and accessories that we prescribe for Franchised Businesses as of the time you are preparing to open.

1.12.    **"Franchised Business"** means the business that you operate under this Agreement at and from the Approved Location. "Franchised Businesses" means your Franchised Business plus all other businesses that we have authorized to operate under the Marks and System by means of a valid franchise agreement.

1.13.    **"Gross Revenue"** means all revenue from the sale of products and services and all other income of every kind related to the Franchised Business, whether for cash, credit, trade, barter or other value and regardless of collection in the case of credit and even if you have contracted with third parties to provide certain of the services, less any bona fide refunds given to customers in the ordinary course of business. Gross Revenue also includes amounts billed to insurance or government programs. You agree that "Gross Revenue" includes all revenue related to the sale of any products and the performance of any services (whether or not the products or services are approved by Franchisor) that are provided using any portion of the Franchised Business in any manner, including the Marks (such as service vehicles, invoices, and uniforms bearing the Marks), the System, Confidential Information, any of the employees of the Franchised Business, or the telephone number of the Franchised Business. "Gross Revenue" also includes any proceeds of business interruption insurance. "Gross Revenue" shall not be reduced on account of any fees or commissions you pay to third parties who refer customers. "Gross Revenue" does not include any sales taxes or other taxes you collect from customers and pay directly to the appropriate taxing authority. We reserve the right to modify our policies and practices regarding revenue recognition, revenue reporting, and the inclusion or exclusion of certain revenue from "Gross Revenue" as circumstances, business practices, and technology change.

1.14.    **"Improvement"** means any change, idea, innovation, concept (including any advertising slogan or idea), product, process, or improvement that may enhance or improve the System.

1.15.    **"Key Person"** means the individual who is responsible for the day-to-day operational performance of the Franchised Business and who has the authority to bind Franchisee in all decisions regarding the Franchised Business. The initial Key Person is named in the Data Sheet.

1.16.    **"Marks"** means the logo shown on the cover page of this Agreement and all other trademarks, service marks, logos, and commercial symbols that we expressly designate for use in connection with the System.

1.17.    **"Opening Deadline"** means the date specified in the Data Sheet by which you are required to have the Franchised Business open and operating.

1.18.    **"Proprietary Products"** means products bearing the Marks and/or prepared using formulations and/or methods of preparation developed by or for Franchisor. They may include apparel,

2

Mister Sparky - Franchise Agreement                                                              May 2020
MS0234 – Daniel Ferguson

EX. A - 4

DocuSign Envelope ID: 0E1E8BB7-550C-4861-B5F9-3F750B603416

accessories, and other products sold or used in the Franchised Business. We have the right to modify, discontinue, substitute, and/or add items to the Proprietary Products from time to time in our sole discretion.

       1.19.    **"System"** means the know-how and system of operation developed for the Brand and owned by Franchisor. The distinctive elements of the System include, but are not limited to: the products and services offered; customer service standards; the warranty program, if applicable; standards and specifications for equipment, technology, supplies, and operations; our advertising and promotional programs and marketing techniques; the exterior and interior design, décor, color scheme, fixtures, and furnishings of the business premises; and the accumulated experience reflected in our Brand Standards Manuals, training program, and instructional materials.

       1.20.    **"Territory"** means the geographic area defined in the Data Sheet and/or in a map attached to the Data Sheet.

## 2.      FRANCHISE GRANT AND TERRITORIAL PROTECTION

       2.1.    <u>Right Granted</u>. We grant you the right, and you undertake the obligation, on the terms and conditions of this Agreement, to establish and operate one (1) Franchised Business at the Approved Location only, and to use the Marks and the System only in connection with the Franchised Business, and only within the Territory. You agree to operate the Franchised Business for the full Agreement term specified in Section 3.

       2.2.    <u>Territorial Protection</u>. While this Agreement is in effect, and provided that you are not in default beyond any applicable cure period, we will not operate a business under the Marks and the System in the Territory or authorize others to operate Franchised Businesses within the Territory, except as permitted under Sections 2.3, 2.4 and 2.5 below. This does not prohibit us from advertising or soliciting employees or independent contractors in your Territory.

       2.3.    <u>Rights Reserved</u>. We and our affiliates retain all rights not expressly granted to you, including the rights (despite anything to the contrary in Section 2.2 and regardless of the proximity to or effect on the Franchised Business):

       **2.3.1**    To establish, operate, franchise, and license others to operate businesses under the Marks at any location outside of the Territory;

       **2.3.2**    To operate a business under the Marks inside the Territory if: (i) Franchisor (or its affiliate) is operating a business under the Marks in the Territory as of the Agreement Date; or (ii) Franchisor has notified Franchisee before Franchisee signed this Agreement that Franchisor (or its affiliate) intends to operate a business under the Marks in the Territory;

       **2.3.3**    To use the Marks in other lines of business, anywhere in the world;

       **2.3.4**    To establish and operate, and to grant others the right to establish and operate, similar businesses or any other businesses offering similar or dissimilar products and services through similar or dissimilar channels of distribution, at any locations inside or outside the Territory, under trademarks or service marks other than the Marks.

       **2.3.5**    To develop, manufacture, have manufactured, advertise, market, sell and distribute, at retail or wholesale, and license others to manufacture, sell or distribute, goods or services that are identical or similar to and/or competitive with those provided at the Franchised Business, whether under the Marks or any other name or mark, through dissimilar channels of distribution, including but not limited

3

to through the Internet, mobile applications, telemarketing, retail stores, and wholesale clubs, or other distribution outlets (other than Franchised Businesses) both inside and outside the Territory;

          **2.3.6**   To establish and operate, and to grant others the right to operate, businesses offering dissimilar products and services both inside and outside the Territory under the Marks; and

          **2.3.7**   To acquire, be acquired by, or merge with other brands or outlets, even if the concepts or outlets are similar to the business operated under the System, and even if they have locations in the Territory. We will also have the right, in our sole discretion, to convert one or more outlets of the acquired, acquiring or merged brand to a Franchised Business within the Territory.

       **2.4.**   <u>Activities Outside of the Territory</u>. You may not perform services or sell products related to the Franchised Business outside of the Territory without our prior written consent, which we may give and withdraw as we deem appropriate, and which we may condition on obtaining a separate phone number or other requirements. You may not solicit or advertise to customers outside of the Territory without our permission. **"Solicit"** includes, but is not limited to, solicitation in person, by telephone, by mail, through the Internet, social media, email or other electronic means, and by distribution of brochures, business cards or other materials or any other advertising. If any solicitation of customers within the Territory is in media that will or may reach persons outside of the Territory, you are required to notify us in advance and obtain our consent. If you receive a request for services or products from outside the Territory, you are required to refer that request to the Franchised Business located in the applicable territory (or to Franchisor or its affiliate, if we have not assigned the applicable territory to a Franchised Business). Notwithstanding the foregoing, under certain limited circumstances, Franchisee may process a request from outside of the Territory if the requested service is permitted under our policies as set forth in the Brand Standards Manuals or otherwise designated by Franchisor. If Franchisor permits Franchisee to advertise, solicit, service or sell in areas outside of the Territory that are not serviced by another Franchised Business or by Franchisor or its affiliate, Franchisee is required to comply with all of the conditions and other requirements that we may from time to time specify in the Brand Standards Manuals or otherwise in writing with respect to such activities. We may at any time condition your continued out-of-Territory sales and services on your agreement to purchase the franchise rights for the territory in which the sales and services are being performed. At any time upon our demand or upon notice from us that the territory in question has been assigned to another Franchised Business, Franchisee agrees to immediately cease all activities in that territory and to comply with our procedures for the transition of customer accounts for that territory. Under no circumstances will we be liable to you for violations by other Franchised Businesses of our policies on out-of-Territory sales and services.

       **2.5.**   <u>Key Accounts</u>. Franchisor may from time to time enter into agreements to provide services to customers as part of a national, regional or key account program ("**Key Accounts**") at locations which include locations within the Territory. You agree to accept and perform the terms of such agreements (including, without limitation, special pricing, payment terms, timing of services, and central invoicing) in respect of locations within the Territory. If you refuse to perform the required services or we determine that the Franchised Business is not qualified, interested, able or available to perform the services, you are required to allow either Franchisor's employee or another franchisee to enter the Territory to perform the required services. In the case of an agreement under which the customer will pay a fixed amount for services at all locations listed in the agreement, we may allocate the fixed amount among the businesses performing the services.

       **2.6.**   <u>No Other Sales Channels</u>. You may not offer products or services through any channel other than those we have expressly approved. If you request approval of any other distribution channel or type of outlet, we will consider the factors we deem appropriate, which may include the period of time you have been operating the Franchised Business, your sales volume, whether you have met quality standards

4

Mister Sparky - Franchise Agreement                             May 2020
MS0234 – Daniel Ferguson

EX. A - 6

and other benchmarks, and other standards that we may determine. This Agreement does not license you to sell products to any vendor who would in turn sell to consumers. This Agreement does not restrict Franchisor or its affiliates from engaging in, and does not grant you any rights to participate in, any other business concepts of Franchisor or its affiliates other than the Franchised Business.

2.7.    Relocation. You may not relocate the Franchised Business without our prior written consent. Any relocation must be to a location within the Territory. Unless otherwise agreed in writing, relocation of the Franchised Business does not change the Territory.

## 3.    AGREEMENT TERM

This Agreement will expire on the anniversary of the Agreement Date specified in the Brand Appendix (the "**Expiration Date**"). You will have an opportunity to renew the franchise rights when the term expires, subject to the terms of Section 19 and provided that you meet the conditions in that Section.

## 4.    PRE-OPENING

4.1.    Preparation for Opening. You are required to prepare your Franchised Business and business premises as necessary to conform to the Brand Standards. The Brand Standards may require expenditures for, among other things, structural changes and modification of the premises; new or modified service vehicles, equipment, signs, fixtures and furnishings; interior and exterior remodeling and redecoration; installation of new technology and/or additions and upgrades to existing technology; and resurfacing of parking areas. As applicable, and as may be designated by Franchisor, you are required to order the Equipment Package and all other technology equipment, signs, fixtures, furnishings, inventory, and supplies from a Designated Vendor. If required by the Brand Appendix, you are required to pay us specified fees for outfitting the Franchised Business. You are required to notify us of the anticipated completion date and provide updates as requested during the build-out process. During the pre-opening period, you are required to permit our representatives to inspect the premises at reasonable times. We may specify further details of the build-out process in the Brand Standards Manuals.

4.2.    Permits. You are required to obtain all zoning classifications, permits, and clearances (including, as applicable, construction permits, certificates of occupancy, health permits, environmental permits, sign permits, and mall or strip center clearances) that may be required by federal, state, or local law or your landlord for the Franchised Business. You have sole responsibility for operating your Franchised Business in compliance with all permits and laws.

4.3.    Pre-Opening Marketing. You are required to conduct pre-opening marketing, as specified in Section 10.3, to attract an initial customer base for the Franchised Business.

4.4.    Approval to Open. You agree not to open the Franchised Business for business until we notify you that: (1) all of your pre-opening obligations have been fulfilled; (2) pre-opening training of your personnel has been completed as required by Section 5; and (3) we have been furnished with copies of all certificates of insurance required by Section 9.1.

4.5.    Opening Deadline. You are required to open the Franchised Business to the public by the Opening Deadline. If you request an extension of the Opening Deadline, we have complete discretion whether to give an extension. If we agree to an extension, we have the right to charge you an extension fee of up to $1,000 per month of extension.

4.6.    Opening Support. We will provide such opening support and assistance for the Franchised Business as we deem appropriate, at the time(s) and in the manner we determine. If you request opening

Mister Sparky **-** Franchise Agreement                                                                                May 2020
MS0234 – Daniel Ferguson

EX. A - 7

support beyond what we customarily furnish to Franchised Businesses, and if we agree to furnish such additional support, then we will have the right to impose a fee, plus expenses, for providing the agreed additional support.

## 5.    TRAINING

**5.1.**    Initial Training. Franchisor will offer, at the time(s) and location(s) selected by Franchisor, a pre-opening training program to Franchisee and to those employees of Franchisee whom Franchisor deems appropriate. The individuals that we designate are required to successfully complete the pre-opening training. We have the right to vary the duration and content of initial training based on the trainee's prior experience in similar businesses. We alone have the right to judge whether a person has successfully completed the training program. Successful completion may require passing tests to establish proficiency in the delivery of services, use of technology and software applications, and other areas we designate. We will have the right to terminate this Agreement under Section 16.1 if, at any time during the pre-opening training program, we conclude in our sole judgment that any person required to attend the pre-opening training program does not possess the skills necessary to properly fulfill and discharge the demands and responsibilities required by the System or this Agreement.

**5.2.**    Additional Training. After the Franchised Business opens for business, we will make available, at the time(s) and location(s) we designate, such other required and optional training programs as we deem necessary and appropriate. For training that we designate as required, the individuals that we designate are required to successfully complete the training.

**5.3.**    Training Methods. We have the right to provide training programs in person, by video, via the Internet, or by other means, as we determine, and the training may be performed by us, our affiliates, or third parties.

**5.4.**    Training Fees. We may charge a training fee: (a) for additional trainees that you request in excess of the maximum number we designate for a training program; (b) if we require remedial training as a result of your failure to comply with our Brand Standards; (c) for re-training persons who are repeating a training program, or their substitutes; and (d) for training programs that we make optional for franchisees.

**5.5.**    Travel Expenses. For all training, including initial training, you are responsible for all travel expenses, living expenses, wages, and other expenses incurred by your trainees. If we conduct training at any location other than our headquarters, you may be required to pay the reasonable travel, meal and lodging expenses of our trainer(s).

**5.6.**    Training Assistance. After the Franchised Business opens, you agree to give us reasonable assistance in training or assisting other franchisees of the Brand. We will reimburse you for your reasonable costs and expenses in providing such assistance.

**5.7.**    Employee Training. Except for the training in Sections 5.1 and 5.2, you are responsible for all employee training for the Franchised Business.

**5.8.**    Annual Conference; Non-Attendance Fee. The Key Person and/or Owners of Franchisee, as designated by us, are required to attend an annual conference of franchise owners, if called by us. Franchisee is responsible for the costs of travel and accommodations of its attendees. Franchisor reserves the right to charge a fee for the annual convention. If none of the designated Franchisee representatives attend the annual convention, we may charge Franchisee a non-attendance fee of $2,000. If the Key Person, Owners, and/or employees of Franchisee, as designated by us, do not attend the annual convention for two (2) consecutive years, you will be in default of this Agreement, and we will have the right to terminate this

6

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 8

Agreement (or, in lieu of termination, increase your royalty fee by one percent (1%) of Gross Revenue under Section 7.6 until you attend the annual convention as designated by us), as well as any other rights and remedies available to us at law or in equity.

## 6. OPERATION OF THE FRANCHISED BUSINESS

**6.1.** <u>Compliance with Brand Standards</u>. In order to protect the reputation and goodwill of the Brand and to maintain high standards of operation under the System, you agree to comply strictly with all of our required Brand Standards. You acknowledge that the Brand Standards may relate to any aspect of the appearance, operation, and marketing of the Franchised Business. Any material failure to comply with the required Brand Standards or to pass our inspection will constitute a material breach of this Agreement. However, you acknowledge that we have the right to vary our standards and specifications to accommodate the individual circumstances of different franchisees. Franchisor's specifications do not constitute a warranty or representation, express or implied, as to quality, safety, suitability, fitness for a particular purpose or any matter. We will not be liable to you or others on account of the designation of Brand Standards for the operation of the Franchised Business under the System.

**6.2.** <u>Management</u>. The Franchised Business is required at all times to be under the day-to-day supervision of the Key Person. We have the right to rely on any statement, agreement, or representation made by the Key Person. If the Key Person leaves your organization, you are required to nominate a replacement within thirty (30) days thereafter. If you have not obtained our approval of a replacement within ninety (90) days, you will be in material default of this Agreement.

**6.3.** <u>Approved Products and Services</u>. You are required to offer for sale from the Franchised Business all products and services that we designate from time to time as required items. You may also offer for sale any optional products and services that we have approved for sale in the Franchised Business. You are prohibited from offering any unapproved products or services without our prior written consent. You acknowledge that the service system and processes are integral to the System and that failure to adhere to them strictly will constitute a default of this Agreement. You are required to discontinue selling or offering for sale any products or services that we disapprove at any time, in our sole discretion.

**6.4.** <u>Pricing and Promotional Activities</u>. To the extent permitted by applicable law where the Franchised Business is located, we have the right to establish maximum and/or minimum prices that you are required to follow for products and services sold in the Franchised Business. Subject to applicable law, you are required to participate in and comply with the terms of special promotional activities that we prescribe for Franchised Businesses generally or for Franchised Businesses in specific geographic areas or having particular characteristics. You acknowledge that these activities may include special offers and other pricing promotions. Subject to the limitations in Section 10, you agree to bear your own costs of participating in these activities. You are required to display promotional signs and materials and otherwise participate in the manner we request.

**6.5.** <u>Telephone Numbers</u>. You are required to obtain one or more separate telephone numbers that are identified with the Franchised Business and no other business. At the termination or expiration of this Agreement, those telephone numbers and any online listings become our property. Simultaneous with signing this Agreement, you agree to sign the Telephone Number and Internet Agreement attached as Appendix D, duly appointing us as attorney-in-fact to effect a transfer to us of the telephone numbers and online listings for the Franchised Business upon expiration or termination of this Agreement. We may require that telephone numbers and electronic identities you use in connection with the Franchised Business be owned and controlled by us or an approved supplier, and that you transfer to an approved call routing and tracking supplier all telephone numbers associated with the Franchised Business.

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 9

**6.6.**    <u>Live Voice and Call Center</u>. Telephone calls to the Franchised Business are required to be answered by "live" voices during the hours specified in the Brand Standards Manuals. You may not have calls answered by answering machines, voicemail, or digital assistants. We may require or prohibit forwarding calls to mobile phones. If you do not comply with the "live" voice requirement as stated in the Brand Standards Manuals, we have the right to increase your royalty by one percent (1%) of Gross Revenue, in addition to any other remedies available to us under this Agreement, including default and termination. We also have the right to require you to use a designated call center for the Brand (the **"Call Center"**) for incoming calls. We will charge you a fee for using the Call Center service, whether the service is required or optional. As of the Agreement Date, the Call Center Fee is the amount set forth in the Brand Appendix and is due at the same time as your royalty payments. We reserve the right to increase the Call Center Fee, to charge a minimum fee for this service, and to change the timing of payment of the fee. We also reserve the right to terminate your access to the Call Center or to cancel the Call Center program. We will provide you at least thirty (30) days' notice prior to terminating the Call Center, modifying the Call Center Fee, or changing the timing of payment.

**6.7.**    <u>Technology Requirements</u>. We have the right to specify the point-of-sale (POS) system, customer relationship management (CRM) system, back-office system, software applications, audio/visual equipment, security systems, electronic payment devices, and other hardware, software, and network connectivity for the Franchised Business. You agree to sign any standard license agreement or user agreement that may be required to use a system that we specify. You are required to use the required systems for service calls, managing inventory, reporting Gross Revenue and other information, training personnel, and other functions as we specify from time to time. You are required to ensure that your employees are adequately trained to use the systems and that they follow applicable policies. You are required to maintain your technology systems in good working order at all times and promptly install upgrades, additions, modifications, substitutions and/or replacements of hardware, software, connectivity, power, and other system components as necessary. You agree to bear all costs of acquisition, installation, use, maintenance and upgrade of your systems.

**6.8.**    <u>Franchisee Portal</u>. We have the right (but no obligation) to establish one or more websites and/or mobile applications that are open only to franchisees (the **"Franchisee Portal"**). If applicable, you are required to use the Franchisee Portal for reporting, training, ordering merchandise and supplies, or other purposes as we direct.

**6.9.**    <u>Payment Systems and Customer Retention Programs</u>. You are required to participate in programs relating to gift cards, gift certificates, stored value cards, online or mobile coupons or credits, online or mobile ordering systems, and other electronic money programs we prescribe from time to time for Franchised Businesses. Participation includes both issuing program benefits or credits and accepting them for payment by customers, and may require you to purchase additional equipment. We have the right to coordinate the crediting and debiting of funds among Franchised Businesses based on customer purchases and redemption of stored value. You are required to comply with our policies regarding acceptance of payment by credit and/or debit cards, mobile payment systems, and digital coupons, including, for example, minimum purchase requirements and/or surcharges for use of a card. You are required to also participate in any customer loyalty programs we prescribe from time to time. You may not offer your own gift card, electronic money, or loyalty program for the Franchised Business without our prior written approval. You acknowledge that payment systems and loyalty programs may require you to obtain new hardware, software, equipment and training at your own expense.

**6.10.**    <u>Sourcing</u>. We have the right to require that all equipment, technology, inventory, supplies, vehicles, signs, furnishings, fixtures, décor items, retail merchandise, payment systems, and other products and services that you purchase for use or resale in the Franchised Business: (a) meet specifications that we establish from time to time; and/or (b) be purchased only from vendors that we have expressly approved;

Mister Sparky - Franchise Agreement                                           May 2020
MS0234 – Daniel Ferguson

and/or (c) be purchased only from a single source (which may include us or our affiliates) at the then-current price. To the extent that we establish specifications, require approval of vendors, or designate specific vendors for particular items, we will notify franchisees via the Brand Standards Manuals or otherwise. We and our affiliates will earn revenue and profits on sales that we make directly to you. We may negotiate purchasing arrangements under which vendors agree to make goods or services available to Franchised Businesses on specific terms. You agree to participate in and abide by the terms of any vendor purchase program established by Franchisor. Subject to applicable law, we may earn money in the form of rebates, licensing fees, administrative fees, commissions, or other payments from vendors based on your purchases. Subject to applicable laws and our arrangements with the vendors, we have no obligation to remit the funds to you.

6.11.    Inventory. You are required to keep a sufficient inventory of products, merchandise, and supplies in the Franchised Business to meet the Brand Standards (or to meet reasonably anticipated customer demand, if we have not prescribed specific standards).

6.12.    No Liability for Others' Products. We disclaim all express and implied warranties and all other liability concerning any defects, malfunctions, or other deficiencies in equipment or other products manufactured by anyone other than us or our affiliates. You agree not to make any claims against us or our affiliates with respect to products that we and our affiliates did not manufacture, even if we or our affiliate sold you the product or designated or approved its source. You are required to assert any claims only against the manufacturer of the product, even if you obtained it through us or our affiliate.

6.13.    Use of Approved Location; Hours of Operation. You are required to use the Approved Location only for the operation of the Franchised Business, to keep the Franchised Business open and in normal operation for the minimum hours and days specified in the Brand Standards Manuals (subject to applicable laws), and to not use or permit others to use the Approved Location or the Franchised Business for any other purpose or activity without first obtaining our written consent. You acknowledge that we may vary the minimum hours and days of operation by market, type of facility, or other basis.

6.14.    Required Equipment, Vehicles, Signs, Furnishings and Other Items. Throughout the Agreement term, you are required to acquire, use and install, as we may require, at your expense, all equipment, vehicles, technology, audio/visual equipment, security features, décor, furnishings, promotional materials, and signs that we require from time to time. You must not install or use in the Approved Location or Franchised Business any equipment, vehicles, technology, furnishings, signs, vehicle graphics, or other items that we have not approved.

6.15.    Condition of Business Assets. You are required to keep the equipment, vehicles, signs, and other tangible assets of the Franchised Business in a clean, orderly condition and in excellent repair and condition, at your own expense. At our request, you are required to provide us with copies of any report of inspection of the Franchised Business conducted by a vendor or government agency.

6.16.    Condition of Premises. If customers routinely visit the Approved Location, then you are required to periodically remodel your business premises to conform to our then-current Brand Standards for a new Franchised Business. We will not require remodeling more often than once every five (5) years. Remodeling may require expenditures for, among other things, replacement or renovation of furnishings, fixtures, equipment, and signs; interior and exterior painting, flooring and redecoration; and upgrades to technology, restrooms, and customer amenities. The remodeling obligation in this section is separate from and does not limit your obligations in any other Section of this Agreement or in your lease.

6.17.    Customer Contracts. In the marketing and operation of the Franchised Business, Franchisee is required to use only the customer contracts, waivers, and/or other forms designated by Franchisor from

9

Mister Sparky - Franchise Agreement                                                                    May 2020
MS0234 – Daniel Ferguson

EX. A - 11

time to time, except where Franchisor does not designate such items. Franchisor may provide Franchisee with templates or sample forms of such items, but it is Franchisee's responsibility to have all items which are to be used with prospective and/or actual customers reviewed, at Franchisee's expense, by an attorney licensed to practice law in the state(s) where the Franchised Business is operated, for compliance with all applicable state and local legal requirements. Franchisor makes no warranty or representation that any contracts, waivers and/or other forms and/or materials, whether supplied by Franchisor or otherwise, are in compliance with the laws of any particular state(s) or locality.

    **6.18.**    Customer Warranty or Guarantee. If the Brand Standards include a customer warranty or a satisfaction guarantee, you are required to provide the warranty or satisfaction guarantee to each customer and comply with the requirements of the warranty/guarantee program, as set forth in the Brand Appendix and/or the Brand Standards Manuals.

    **6.19.**    Performance Requirements. You agree to continuously exert best efforts to promote and enhance the performance of the Franchised Business and the goodwill of the Marks. If minimum performance requirements are set forth in the Brand Appendix (the **"Minimum Performance Requirements"**), you are required to achieve those Minimum Performance Requirements. If you do not achieve the Minimum Performance Requirements, we will have the right to: (i) reduce the size of the Territory; (ii) establish or license a third party(ies) to establish a Franchised Business within the Territory; (iii) require Franchisee to implement a revenue improvement program, as we specify, which may include, among other things, engaging in specified marketing activities, by the conclusion of which Franchisee is required to achieve the Minimum Performance Requirements; or (iv) terminate this Agreement. If we elect the option in clause (iii), your failure to comply with the terms of the revenue improvement program or failure to achieve Minimum Performance Requirements will allow us to terminate this Agreement. You acknowledge that the Minimum Performance Requirements are not a representation or guarantee of any financial results to Franchisee from the exercise of the rights granted in this Agreement.

    **6.20.**    Territory Visits and Inspections. You are required to permit our representatives to inspect the operations of the Franchised Business and to enter your business premises during normal business hours to review records, to observe, photograph and record operations, to remove samples of goods, materials and supplies for testing and analysis, and to interview your customers, employees, and vendors. You are required to provide assistance as requested by our representatives. Upon notice from us, you are required to immediately begin any steps necessary to correct deficiencies noted during a Territory visit.

    **6.21.**    Brand Standards Assessments. You are required to comply with our Brand Standards monitoring program, at your own expense. The program may include, among other things, customer satisfaction surveys, mystery shopper reports, employee satisfaction and perception surveys, health and safety reviews, and third-party observation of your operations. If you do not achieve the minimum score or standard that we prescribe for a specific Brand Standards category, we may require you and/or your employees to complete additional training at a location we designate, at your expense. If you do not achieve the prescribed minimum score or standard on two consecutive assessments or on three or more assessments in any five (5) year period, we will have the right to terminate this Agreement under Section 16.1.

    **6.22.**    Brand Programs. You are required to participate in and comply with any other programs that we prescribe for Franchised Businesses, as specified in the Brand Appendix.

    **6.23.**    Employer Responsibilities. You are required to maintain proper staffing in the Franchised Business to meet the Brand Standards. You have sole responsibility for all employment decisions and functions relating to the Franchised Business, including but not limited to decisions related to recruiting, screening, hiring, firing, scheduling, training (other than the training in Section 5), compensation, benefits, wage and hour requirements, recordkeeping, supervision, safety, security and discipline of employees. Any

10

information we provide about employment matters, whether voluntarily or in response to your request, and whether directly or by means of any technology tools, is a recommendation only and not intended to exercise control over the wages, hours or working conditions of your employees or the means and manner by which they carry out their duties. In addition, we may provide you with access to an independent, third-party employment law hotline (the "Hotline"). You acknowledge that we have no liability with respect to any advice you may receive through the Hotline or otherwise in connection with your use of the Hotline and we may discontinue offering access to the Hotline at any time. You alone will direct and control all employees of the Franchised Business, subject only to the Brand Standards that we prescribe to protect the goodwill associated with the Marks, which may include the requirement of initial and periodic drug testing and background checks. You are required to clearly inform all workers, before hiring and periodically thereafter, that Franchisee, and not Franchisor, is their employer and that Franchisor does not assume and will not accept any employer, co-employer, or joint employer obligations. You agree to indemnify us for any liability, cost, expense, loss or damage, including attorney's fees and costs, arising from (i) any claim or allegation that Franchisor or any affiliate is the employer, co-employer, or joint employer of Franchisee, its Owners, or any workers in the Franchised Business, and (ii) your use of the Hotline or reliance on any information received during your use of the Hotline.

6.24.   Modifications to System. You acknowledge that we can modify the System and the products and services offered by the Franchised Businesses from time to time (such as, but not limited to, by adding, deleting, and changing approved products or services, equipment, operating procedures, and Brand Standards). You agree to comply, at your own expense, with all such modifications, including without limitation any associated replacement or renovation of equipment, remodeling, redecoration, modifications to existing improvements, and structural changes.

6.25.   Compliance with Lease. You are required to comply with all terms of the lease or sublease for the Approved Location and all other agreements affecting the operation of the Franchised Business. You are required to use best efforts to maintain a good working relationship with your landlord and refrain from any activity that may jeopardize your right to remain in possession of the Approved Location.

6.26.   Compliance with Laws. You are required to operate the Franchised Business in compliance with all applicable municipal, county, state and federal laws, rules, regulations and ordinances, including maintaining all regulatory licenses. Additional details may be set forth in the Brand Appendix. You have sole responsibility for compliance despite any information or advice that we may provide.

6.27.   Taxes and Indebtedness. You are required to promptly pay when due all taxes and all accounts and other indebtedness you incur in the operation of the Franchised Business. In the event of any bona fide dispute as to your liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but you may not permit a tax sale or seizure or attachment by a creditor against the Franchised Business.

7.   **FEES**

7.1.   Franchise Fee. You are required to pay us a non-refundable initial franchise fee in the amount shown in the Data Sheet. The initial franchise fee is due when you sign this Agreement.

7.2.   Royalty. Beginning at the earlier of the Opening Deadline or when the Franchised Business opens, you are required to pay us an ongoing royalty fee in the amount shown in the Brand Appendix. Unless we designate a different period, the royalty fee will be paid on the schedule shown in the Brand Appendix.

Mister Sparky **-** Franchise Agreement                                                                                   May 2020
MS0234 – Daniel Ferguson

EX. A - 13

**7.3.** <u>Brand Fund Contribution</u>. You are required to contribute to the Brand Fund on an ongoing basis the amount shown in the Brand Appendix. The Brand Fund contribution will be calculated for the same period and paid in the same manner as the royalty fee and will be used as described in Section 10.2.

**7.4.** <u>Technology Fees</u>. You are required to pay us fees as specified in the Brand Appendix to support development and operation of software, portals, websites, email accounts, mobile applications, social media, and other technology and communications channels. Unless we designate a different period, the technology fees will be paid on the schedule shown in the Brand Appendix. We can revise technology fees at any time on reasonable notice, which need not be more than thirty (30) days.

**7.5.** <u>Service Deficiency Reimbursements</u>. If a customer of the Franchised Business complains to us that your services were deficient and we determine, after discussion with you, that there is merit to the customer's complaint, we reserve the right to perform or cause to be performed services to the customer's satisfaction or to reimburse the customer for any money the customer may have paid for the deficient services. You are required to promptly reimburse us for any costs we incur to perform the services or to reimburse the customer, upon receipt of an invoice from us.

**7.6.** <u>Non-Compliance Royalty Rate</u>. If we determine that Franchisee is not in compliance with this Agreement, we are entitled to give notice declaring Franchisee non-compliant. Such notice shall be delivered with sufficient detail to provide Franchisee the opportunity to cure its non-compliance. As of the first Royalty Fee payment due date to occur more than ten (10) days after delivery of the notice of non-compliance by Franchisor, and continuing until the non-compliant condition has been removed, Franchisor shall have the right to assess Royalty Fees at the rate one percent (1%) higher than the rate payable under Section 7.2, in Franchisor's sole and absolute discretion. This right is cumulative of all other rights of Franchisor arising from Franchisee's non-compliance.

**7.7.** <u>Payment Method</u>. For all amounts payable to us, you are required to use the payment method(s) that we designate from time to time. If we require payment by Automated Clearing House (ACH) or electronic funds transfer, you are required to designate an account at a commercial bank of your choice (the **"Account"**) from which we are able to make withdrawals. You agree to complete and submit to us an authorization for Automated Clearing House or other electronic funds transfer in the form attached to this Agreement as Appendix E or such other form as we or your financial institution may require. You agree to maintain sufficient funds in the Account to cover the amounts payable to us. If funds in the Account are insufficient to cover the amounts payable at the time we make our periodic electronic funds transfer, the amount of the shortfall will be deemed overdue. Additionally, if the electronic funds transfer payment request is returned due to insufficient funds, you are required to pay us a fee equal to the greater of: (a) $50 or (b) the amount the bank charges us due to the insufficient funds.  If we permit you to pay with a credit card, you agree to reimburse us for the resulting charges we incur, subject to applicable law.

**7.8.** <u>Late Reports and Estimated Payments</u>. If Franchisee's Gross Revenue report required by Section 8 is not received when due, (i) all payments owed by Franchisee for such time period shall be deemed overdue until the reports are received by Franchisor, regardless of whether payment was actually made; (ii) Franchisee shall be responsible for applicable late fees and interest under Section 7.9; and (iii) Franchisor will have the right to estimate Gross Revenue (and Franchisee agrees that 15% greater than previously reported Gross Revenue is a reasonable estimate, among other methods to estimate) and to draft from Franchisee's bank account the estimated amount due for royalties, Brand Fund contributions, and any other charges that are calculated based on Gross Revenue. When you provide the delinquent report(s), we will reconcile any difference between the estimated amount and the actual charges due for the period, and, if an overpayment, we will credit you on your next payment obligation to us.

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 14

**7.9.** <u>Interest and Late Fees</u>. If any payment to us is overdue, you are required to pay us, in addition to the overdue amount, interest on the overdue amount from the date it was due until paid, at the rate of 12% per annum or the maximum rate permitted by law, whichever is less. In addition, we will have the right to charge a late fee of $100 for the second occurrence of a payment or report that is more than thirty (30) days past due, $200 for the third such occurrence, and $300 for the fourth and each subsequent occurrence. The late fee is to compensate us for our administrative costs incurred in enforcing your obligation to pay us or submit reports to us.

**7.10.** <u>Security Interest</u>. To secure payment of: (a) the amounts you owe to us and our affiliates from time to time under this Agreement and under any other agreement between you and us or our affiliates; and (b) the costs and expenses that we and our affiliates incur to collect or attempt to collect amounts due from you and to enforce this Section (together, the **"Obligations"**), you hereby grant us a security interest in all of the assets of the Franchised Business, including but not limited to: (i) all equipment, furnishings, fixtures, motor vehicles, merchandise, inventory, goods and other tangible personal property; (ii) all accounts, accounts receivable, other receivables, contract rights, leases, software, chattel paper and general intangibles; (iii) all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, bank accounts and cash; (iv) all books, records and documents; (v) all permits and licenses for the operation of the Franchised Business; and (vi) all accessions, additions and improvements to, and all replacements, substitutions and parts for, and all proceeds and products of, the foregoing, including proceeds of insurance (collectively, the **"Collateral"**). Franchisee agrees to execute and deliver to Franchisor any other documents reasonably requested by Franchisor to create, maintain, perfect, or assure the priority of the security interest granted above. Franchisee hereby appoints Franchisor as its agent and attorney-in-fact to execute and deliver documents and to take all other actions (to the extent permitted by law) in Franchisee's name and on Franchisee's behalf that Franchisor may deem necessary or advisable to create, maintain, perfect, assure the priority of, or foreclose its security interest in and lien on the Collateral. This appointment is coupled with an interest and is irrevocable as long as any of the Obligations remain outstanding.

**7.11.** <u>No Set-off; Application of Payments</u>. Your obligation for timely payment of the fees in this Agreement is absolute and unconditional. You may not set off, deduct, delay, escrow, or withhold any payment based on our alleged non-performance of obligations, including any money you allege that we or our affiliates owe you or any other claims that you believe you have against us or our affiliates. We can apply payments received from you to royalty fees, Brand Fund contributions, technology fees, purchases from us or our affiliates, interest, late charges, or any other obligation in the order we choose, regardless of any designation you make.

**7.12.** <u>Taxes</u>. The payments that you are required to make to us must be the gross amount determined according to the applicable section of this Agreement without deduction for any taxes. You will pay all state and local taxes, including, without limitation, taxes denominated as franchise, business, gross receipts, commercial activity, property, ad valorem, sales, use, or excise taxes, that may be imposed on us or you arising out of or related to our receipt or accrual of fees referenced under this Agreement or related agreements, or ownership or use of any property or materials in your Territory in the course of providing services to you under this Agreement. In any case, you will pay to us (and to the appropriate governmental authority) such additional amounts as are necessary to provide us, after taking such taxes into account (including any additional taxes, penalties, interests or expenses), with the same amounts that we would have received or accrued had such withholding or other payment, whether by you or by us, not been required. If you fail to withhold or pay any such obligations to the appropriate government authority, you must indemnify us for any obligations including penalties, interest, and expenses (including legal and accounting fees) resulting from your failure to timely withhold or to pay the taxes.

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 15

## 8.    REPORTS, FINANCIAL STATEMENTS, CUSTOMER DATA, AND DATA SECURITY

**8.1.**    <u>Business Records and Reports</u>. You are required to prepare, and to preserve for at least five (5) years from the dates of their preparation, complete and accurate books, records, and accounts, in accordance with generally accepted accounting principles and in the form and manner we prescribe.  We may designate the chart of accounts and/or the accounting program or platform that you are required to use. You are required to provide to us upon request all books, records, tax returns, accounting records, and supporting documents relating to the Franchised Business, including but not limited to daily cash reports, cash receipts journals, general ledgers, cash disbursement journals, weekly payroll registers, monthly bank statements, daily deposit slips, canceled checks, credit card statements, business tax returns, personal tax returns for all Owners and guarantors, supplier invoices, balance sheets, income statements, records of promotions and coupon redemptions, and lists of customers (both current and past) serviced by the Franchised Business. Concurrently with each payment of the Royalty Fee, you are required to send us a report of Gross Revenue for the preceding period, and at our request, you are required to send us accounting records, inventory reports, and such other information and supporting records as we may specify. These records are required to be maintained at the Approved Location except as otherwise permitted by Franchisor.

**8.2.**    <u>Financial Statements and Tax Returns</u>. Within fifteen (15) days after the end of each calendar month, you are required to submit a statement of financial condition (a balance sheet) as of the end of the calendar month and a Profit and Loss financial statement for the month and for the fiscal year-to-date. The financial statements are required to be certified as correct and complete by the Key Person. We have the right to require financial statements on a more frequent periodic basis.  By May 1st of each year, you are required to submit to us a copy of the federal and state tax returns for the Franchised Business for the prior year.

**8.3.**    <u>Parent and Guarantor Financial Statements</u>. At our request, you agree to furnish an annual statement of financial condition for each individual or corporate guarantor of your obligations to us and, if applicable, for each of Franchisee's direct and indirect corporate parents.

**8.4.**    <u>Access to Your Systems</u>. You are required to give us independent access to your systems and provide us with login credentials if necessary for that purpose. You are required to maintain an electronic connection with us at all times.

**8.5.**    <u>Right to Examine or Audit</u>. We have the right, at any time, to examine and copy, at our expense, the books, records, accounts, and tax returns of the Franchised Business and the personal tax returns of the Owners. We also have the right, at any time, to have an independent audit made of the books and records of the Franchised Business. You are required to cooperate with the persons making the examination or audit on our behalf. If you or we discover at any time, by means of an audit or otherwise, that there has been an underpayment of royalty fees or other amounts due, you are required to promptly pay the amount due, together with applicable late fees and interest. Your payment and our acceptance of the overdue amounts will not constitute a waiver of or prejudice our right to exercise any other remedy in this Agreement, including termination.

**8.6.**    <u>Cost of Examination or Audit</u>. If we perform an examination or audit due to: (i) your failure to submit reports of Gross Revenue or required financial statements, or (ii) your failure to maintain books and records as required, or if (iii) the cumulative Gross Revenue you report for any period of three consecutive months is more than 2% below the actual Gross Revenue for the period as determined by the examination or audit, then you are required to pay us the cost of the examination or audit, including travel and lodging expenses for the examiners or auditors. For purposes of calculating the cost, we will use hourly

Mister Sparky - Franchise Agreement                                                                May 2020
MS0234 – Daniel Ferguson

EX. A - 16

rates for our own personnel that are consistent with the rates of mid-level professionals of independent accounting firms.

**8.7.** <u>Business and Customer Data</u>. In this Section: **"Customer Data"** means Personal Information (as defined below), sales and payment history, and all other information about any person or entity the Franchised Businesses have serviced, wherever stored, including data regarding customers of businesses converted to a Franchised Business, and any other information we may identify in the Brand Standards Manuals; **"Personal Information"** includes any information that, by itself or in conjunction with other information, may be used to specifically identify an individual, such as name, physical address, telephone number, e-mail address, social media accounts, billing and payment history, customer service requests, and any other information as defined in applicable law; and "**Business Data**" means all financial reports, vendor and supplier pricing data, and all other data about the Franchised Businesses other than Customer Data. Franchisee acknowledges and agrees that:

**8.7.1** We have the right to independently access all Business Data, wherever maintained. Franchisor also has the right to require Franchisees to deliver Business Data to Franchisor. Franchisor has the right to use (and to authorize others to access and use) Business Data to, among other uses: (i) verify sales; (ii) monitor progress of its franchisees, including compliance with Minimum Performance Requirements; (iii) prepare a financial performance representation for Franchisor's Franchise Disclosure Document; and (iv) share vendor and supplier pricing data with its affiliates.

**8.7.2** Franchisor owns and has the right to access all Customer Data, in whatever form existing, and wherever stored. Because we own the Customer Data, including Personal Information, we can share it with our affiliates, service providers, contracted third parties, or any other person, for any purpose, without notifying or compensating you, both during and after this Agreement, including for the performance of services for Franchisor or its parents or affiliates, as well as for marketing and cross-selling products and services of any of the foregoing parties. Whenever we request, and without request upon termination or expiration of this Agreement, you are required to promptly deliver to Franchisor all Customer Data in your possession or control, without retaining any of Customer Data in any media. You may not sell or disclose to anyone else any Personal Information or aggregated or non-aggregated Customer Data without first obtaining our written consent. In the event of an approved sale of the Franchised Business to a new owner who will continue to operate the Franchised Business under an agreement with us, you may not transfer the Customer Data to the new owner. You agree to install and maintain the security measures and devices necessary to protect Customer Data from unauthorized access or disclosure, including (but not limited to) the minimum measures in Section 8.8.

**8.8.** <u>Privacy and Security</u>.

**8.8.1** You are required to comply with applicable laws and our requirements pertaining to the collection, use, processing, protection, integrity, transfer of, consumer access to, correction of, and deletion of Personal Information. You are required to ensure that you collect Personal Information with express or implied consent of the consumer. Where required by applicable law, you are required to provide a written privacy notice to consumers regarding your collection, use, and disclosure of Personal Information, and are required to comply in all respects with any such written privacy policy. In addition to any restrictions set forth in Section 8.7.2 above, if Franchisor provides Franchisee with Personal Information (i) for the purpose of performing a service on behalf of Franchisor, or (ii) at the direction of the consumer, then the following restrictions shall apply to Franchisee's use of such Personal Information: Franchisee shall not (i) sell, rent, release, disseminate, make available, transfer, or otherwise communicate orally, in writing, or by electronic or other means, Personal Information; (ii) retain, use, or disclose Personal Information for any purpose other than fulfilling the purpose for which it was provided and as permitted in this Agreement, including any restrictions set forth in Section 10; or (iii) retain, use, or disclose Personal

15

Mister Sparky - Franchise Agreement                                                                           May 2020
MS0234 – Daniel Ferguson

EX. A - 17

Information outside of the direct business relationship between Franchisor and Franchisee. If Franchisor provides Personal Information to Franchisee, Franchisee certifies that it understands and will comply with the restrictions and obligations under any applicable laws on such Personal Information. Upon Franchisor's request, Franchisee shall provide reasonable assistance to Franchisor in complying with any request from a consumer to exercise rights under any applicable law. Without limiting the foregoing, upon Franchisor's request, Franchisee shall delete some or all Personal Information that Franchisee maintains.

**8.8.2** You are required to implement industry-standard administrative, physical, and technical security measures and devices to protect data from unauthorized access, acquisition, loss, destruction, disclosure or transfer. Without limiting the foregoing, you agree to comply with the then-current Payment Card Industry Data Security Standards (PCI/DSS), as those standards may be revised by the PCI Security Standards Council, LLC (see *www.pcisecuritystandards.org*) or successor organization; to implement the security requirements that the Council (or its successor) requires of a merchant that accepts payment by credit and/or debit cards; and to complete PCI/DSS audits as and when required by the standards. You acknowledge that compliance with PCI/DSS is not a guarantee that a security breach will not occur, and that any losses or expenses we incur as a result of an actual or suspected security breach will be subject to indemnification under Section 20.

**8.9.** Data and Network Security. You are required to implement industry-standard administrative, physical, and technical security measures and devices to protect data (whether Personal Information, Customer Data, Confidential Information, intellectual property, or other data) and any portion of the Franchised Business from unauthorized access, acquisition, loss, destruction, disclosure or transfer. Franchisee is solely responsible for protecting the Franchised Business from computer viruses, bugs, power disruptions, communication line disruptions, Internet access failures, Internet content failures, and attacks by hackers and other unauthorized intruders. Franchisee waives any and all claims Franchisee may have against Franchisor as the direct or indirect result of such disruptions, failures or attacks. Franchisee is also required to use best efforts to verify that Franchisee's suppliers, lenders, landlords, customers, and governmental agencies on which Franchisee relies, are reasonably protected. This includes best efforts to secure Franchisee's systems, including, but not limited to, use of firewalls, access code protection, anti-virus systems, and backup systems. In the event of a known or suspected security breach, you agree to notify us promptly and comply with applicable laws and any instructions from us regarding response to the breach.

**8.10.** Late Report Fee. To encourage prompt delivery of all Gross Revenue reports, Customer Data, Certificates of Insurance, and any other reports or records required or that may be requested by Franchisor under this Agreement, Franchisee shall pay, upon demand, for each report or record that Franchisee fails to deliver when due, a late report fee under Section 7.8.

**8.11.** Third Party Information. Franchisee hereby authorizes Franchisor and its agents and representatives to make credit and background checks of Franchisee and Owners, and to make inquiries of Franchisee's bank, suppliers, and trade creditors concerning the Franchised Business and hereby directs such persons and companies to provide to Franchisor such information and copies of documents pertaining to the Franchised Business as Franchisor may request.

**8.12.** Licenses. Franchisee is required to provide to us, within 10 days after you receive them and upon our request, true and correct copies of all state and other licenses related to the Franchised Business and correspondence related to renewals, expirations or denials thereof.

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 18

## 9.    INSURANCE

**9.1.**    <u>Basic Requirements</u>. You must maintain the types and minimum amounts of insurance coverage and bonds we specify for Franchised Businesses, at your own expense. The policies must be written by carriers with an industry rating acceptable to us; must name Franchisor, our affiliates, and their respective officers, directors, shareholders, and employees as additional insureds as we direct; and must not have deductibles, exclusions or co-insurance that are unacceptable to us. Each insurance policy must contain a waiver by the insurance company of subrogation rights against Franchisor, its affiliates, and their successors and assigns. You are required to provide us with evidence of all required insurance coverage and payment of premiums at the times we require. At least thirty (30) days before each insurance policy expires, you are required to furnish a copy of renewal or replacement insurance and evidence of payment of the premium. Your obligation to obtain coverage is not limited by insurance that we maintain.

**9.2.**    <u>Changes</u>. We have the right to increase the amounts of insurance coverage required and to require different or additional kinds of insurance. If you do not have the insurance required by this Agreement, we have the right (but no obligation) to obtain insurance on your behalf. If we do so, you agree to reimburse us for the cost of insurance, plus a reasonable fee for our services.

## 10.    MARKETING AND ADVERTISING

**10.1.**    <u>Acknowledgments</u>. You acknowledge the importance of standardization of marketing and advertising programs to the goodwill and public image of the System, the Marks, and Franchised Businesses generally. You further acknowledge our rights in this Section to modify advertising, marketing and public relations programs and the manner in which marketing and advertising funds are used from time to time.

**10.2.**    <u>Brand Fund</u>. You are required to contribute to the Brand Fund as provided in Section 7.3. The purpose of the Brand Fund is to support general recognition of the Franchised Businesses and the Brand. The Brand Fund will operate as follows:

**10.2.1**    We will have the right to direct all advertising, marketing, public relations, and other activities to promote, develop and enhance the Brand, with final discretion over strategic direction, creative concepts, the materials and endorsements to be used, and the geographic market and media placement. We may use the Brand Fund to pay costs and expenses as we determine in our sole discretion, including but not limited to: production of video, audio, written, online and mobile marketing materials; purchasing promotional items; sponsorship of sporting, charitable, or similar events; design, establishment, and maintenance of websites, social media, mobile applications and other electronic marketing; implementation of advertising programs, in-store promotions, direct mail, and media advertising; marketing and sales training; employing advertising agencies; conducting public relations, consumer research, product development, product testing, and test marketing programs; developing and implementing trade dress and design prototypes; fulfillment charges; salaries and expenses of employees of Franchisor and affiliates working for or on behalf of the Brand Fund; fees of accounting firms, design firms, public relations firms, consultants and ad agencies; legal fees for advertising pre-clearance, defense of false advertising claims, and defense of any claims made regarding our administration of the Brand Fund; other administrative costs and overhead incurred in activities related to the administration and activities of the Brand Fund; and interest on any monies borrowed by the Brand Fund.

**10.2.2**    We will make available to you any creative materials financed by the Brand Fund. You agree to pay or to reimburse us for any costs to reproduce the materials and/or to customize the materials for your use.

**10.2.3** We may seek the advice of franchisees by formal or informal means with respect to the creative concepts and media used for programs financed by the Brand Fund. We retain final authority on all programs financed by the Brand Fund. We have the right to incorporate, replace, change or dissolve the Brand Fund.

**10.2.4** We will not be obligated, in administering the Brand Fund, to make expenditures for you that are equivalent or proportional to your contributions, or to ensure that any particular franchisee or Franchised Business benefits directly or pro rata from expenditures by the Brand Fund. You have no right to reduce or withhold contributions based on any alleged lack of benefits to the Franchised Business or based on failure by any other franchisee (with or without our permission) to make its contributions to the Brand Fund.

**10.2.5** Nothing in this Agreement is intended or will be construed to impose a trust or fiduciary duty on Franchisor in connection with the Brand Fund, including, but not limited to, with respect to the collection of contributions, maintenance of the bank account, bookkeeping, and disbursement of monies from the Brand Fund. Except as expressly provided in this Section 10.2, we assume no direct or indirect liability or obligation to you with respect to maintenance, direction, or administration of the Brand Fund.

**10.3.** <u>Pre-Opening and Grand Opening Marketing</u>. You are required to conduct pre-opening and grand opening marketing for the Franchised Business in accordance with a plan that you will create, subject to our approval. You are required to spend at least the amount specified in the Brand Appendix to implement the pre-opening/grand opening marketing plan. We reserve the right to require you to deposit with us the funds required under this Section, which we will distribute as necessary to carry out the approved plan.

**10.4.** <u>Local Marketing</u>. You are required to spend at least the amount specified in the Brand Appendix for local advertising and promotion of the Franchised Business (**"Local Marketing"**). This is in addition to your obligations under Sections 10.2 and 10.3. We have the right to specify that you pay Local Marketing funds to us, our affiliate, or a third party vendor. We and our affiliates may earn revenue and profits on products or services we provide and may receive rebates, licensing fees, administrative fees, commissions, or other payments on products and services that third party vendors provide. With respect to all Local Marketing funds you pay to a third party, you are required to provide us with monthly Local Marketing expense statements (including receipts supporting the reported expenditures) evidencing compliance with the Local Marketing spend requirements. All Local Marketing is required to be approved by us pursuant to Section 10.6 below. You must be listed in the local Internet based directories and in the Yellow Pages or comparable telephone directory if available, as we designate.

**10.5.** <u>Joint Marketing Programs and Cooperatives</u>. We have the right to organize: (1) co-marketing programs in which Franchised Businesses and vendors (or other third parties) cross-promote each other's goods and services; (2) joint marketing efforts in which multiple Franchised Businesses contribute to a specific ad or event; and/or (3) local or regional marketing co-operatives (**"Cooperatives"**) that pool funds of Franchised Businesses in a geographic area or with common characteristics on an ongoing basis to jointly promote the Marks and the Franchised Businesses. The amount we require you to spend or contribute to joint marketing programs and/or a Cooperative will be credited to your obligation for Local Marketing under Section 10.4 or, at our option, to your Brand Fund obligation under Section 7.3, or any combination of the two. You are required to participate in each applicable joint marketing program and comply with the rules of the program. If an existing Cooperative is applicable to your Franchised Business at the time it opens, you are required to immediately become a member of the Cooperative. If a Cooperative applicable to the Franchised Business is established during the term of this Agreement, you are required to become a member no later than thirty (30) days after the date we approve for the Cooperative to begin

Mister Sparky - Franchise Agreement                                                                                               May 2020
MS0234 – Daniel Ferguson

EX. A - 20

operation. We have the right to designate any geographic area or set of common characteristics for purposes of establishing a Cooperative.

**10.6.** <u>Approval Requirement</u>. All proposed advertising and promotional plans and materials that you intend to use are required to meet our standards and specifications and be submitted to us for approval at least thirty (30) days before their intended use. You are required to use the method(s) we specify to submit materials for approval. You do not have to submit samples of plans or materials that were prepared by us or that we have approved within the last twelve (12) months. Proposed advertising plans or materials are deemed to be disapproved unless we have approved them in writing within fifteen (15) days after your submission of the samples. All advertising and promotion is required to be in the media and of the type and format that we approve, conducted in a dignified manner, and conform to our standards.

**10.7.** <u>Ownership of Advertising and Promotional Materials</u>. You acknowledge and agree that Franchisor owns all copyrights and other rights to all existing and future advertising and promotional materials that contain any of the Marks or that otherwise relate to the Franchised Business, as well as any products, materials, and rights that result from any advertising, marketing, and promotional programs created, purchased, produced or conducted by or on behalf of Franchisee, Franchisor, the Brand Fund, or any Cooperative, regardless of the party that created such materials. No copyrights or other rights or interest in any tangible or intangible materials or in the Marks will vest in Franchisee as a result of any contribution to, or participation in, any advertising, marketing, or promotional program. If, notwithstanding this provision, Franchisee is deemed to have acquired any copyrights, contractual rights or common law rights in any advertising programs or materials, Franchisee shall execute (and shall cause its employees and agents to execute) such documents or instruments as Franchisor requests to effect assignment of such rights to Franchisor or its affiliate.

**10.8.** <u>Solicitation of New Franchisees</u>. You acknowledge that we may from time to time develop advertising and promotional materials and displays for the solicitation of franchisees for the Brand. You agree to display all such materials and displays as required by us from time to time.

**10.9.** <u>Media Appearances</u>. You shall not make any television or radio appearance, or make any statement to any public media, in connection with any Franchised Business or the Brand unless you obtain our prior written approval.

**10.10.** <u>Electronic Marketing and Electronic Communications</u>. Unless we have agreed to it in writing, you may not use, register, maintain, or sponsor any website, URL, social media, blog, messaging system, email account, user name, text address, mobile application, or other digital, electronic, mobile or Internet presence that uses or displays any of the Marks (or any derivative thereof) or that promotes any products or services of the Franchised Business. The use of any digital or electronic medium constitutes advertising and promotion subject to our approval under Section 10.6. You agree not to post or transmit, or cause any other party to post or transmit, advertisements or solicitations by telephone, e-mail, text message, instant message, website, social media, mobile apps, VoIP, streaming media, or other electronic media that are inconsistent with our brand advertising guidelines and standards. The brand advertising standards may include the use of disclaimers, warnings, and other statements that Franchisor may prescribe. You are responsible for ensuring that your employees do not violate the policies relating to the use of social media. We have the right to require that social media accounts, profiles, pages, and registrations that primarily promote the Marks or the Franchised Business be registered in Franchisor's name. For any such accounts that we permit to be registered in Franchisee's name, you agree to provide us with the current login credentials within five (5) days after opening the account or changing the credentials. You agree that we have the rights to: (i) access any social media accounts to take corrective action if the account or any postings are in violation of our policies; and (ii) take ownership of the accounts on expiration or termination of this Agreement and operate them thereafter as we see fit. We may offer to provide, or may require that

Mister Sparky **-** Franchise Agreement                                                                                   May 2020
MS0234 – Daniel Ferguson

EX. A - 21

DocuSign Envelope ID: 0F158BB7-5506-48C4-B5F9-3E750B692416

you have, a website for your Franchised Business (which may be structured as a separate page of a consumer website(s) supported by the Brand Fund).

## 11.   LICENSED MARKS AND COPYRIGHTS

**11.1.**   <u>Identification of the Franchised Business; Public Notice of Independent Status</u>. You are required to operate, advertise, and promote the Franchised Business only under the Marks. In conjunction with any use of the Marks, you are required to conspicuously identify yourself in all dealings with customers, employees, contractors, suppliers, public officials, and others as an independent franchisee operating under authority of this Agreement. You are required to display a prominent notice, in the form that we prescribe, in the Franchised Business and on all business cards, stationery, advertising, signs, invoices, and other materials, identifying us as the owner of the Marks and stating that you are a licensed user of the Marks.

**11.2.**   <u>Your Acknowledgments</u>. You acknowledge that: (a) the Marks are valid and serve to identify the Brand and the Franchised Businesses operating under the System; (b) your use of the Marks under this Agreement does not give you any ownership interest in the Marks; and (c) all goodwill associated with and identified by the Marks belongs exclusively to Franchisor. Upon expiration or termination of this Agreement, no monetary amount will be attributable to goodwill associated with your activities as a franchisee under the Marks. Both during and after this Agreement, you agree not to contest or aid in contesting the validity or ownership of the Marks or take any action harmful to our rights in the Marks.

**11.3.**   <u>Limitations on Use of the Marks</u>. You agree to:

**11.3.1**   Use the Marks only for the operation of the Franchised Business within the Territory, for approved activities outside of the Territory, and for approved marketing and advertising for the Franchised Business;

**11.3.2**   Use the Marks to promote and to offer for sale only the products and services that we have approved, and not use any Marks in association with the products, materials or services of others;

**11.3.3**   Use only the Marks designated by us and use them only in the manner we authorize;

**11.3.4**   Comply with our instructions in filing and maintaining any requisite trade name or fictitious name registrations, and sign any documents we deem necessary to obtain protection for the Marks or to maintain their continued validity and enforceability;

**11.3.5**   Not independently register or apply for registration of any trademark, service mark, trade name, domain name or electronic identifier relating directly or indirectly to the Marks, anywhere in the world, without our prior written consent. Any such registration or application by you, whether or not authorized by us, will be deemed to be owned by Franchisor and you agree to take such steps, including signing an assignment document, as we may request to confirm our ownership;

**11.3.6**   Permit us or our representatives to inspect your operations to assure that you are properly using the Marks;

**11.3.7**   Not use the Marks to incur any obligation or indebtedness on our behalf;

**11.3.8**   Not use any of the Marks as part of your corporate or legal name;

**11.3.9**   Not use any of the Marks on any employee forms, employee manuals, employee policies, pay stubs, benefits forms, payroll records, or other employee materials; and

Mister Sparky **-** Franchise Agreement                                                            May 2020
MS0234 – Daniel Ferguson

EX. A - 22

**11.3.10** Ensure that the Marks bear the ``®``, ``™``, or ``SM`` symbol, as we prescribe.

**11.4.** Changes to the Marks. We have the right to change, discontinue, or substitute for any of the Marks and to adopt new Marks that you are required to or may use. You agree to implement any such change at your own expense.

**11.5.** Copyrighted Materials. You acknowledge that Franchisor is the owner of certain copyrighted or copyrightable works (the **"Works"**) and that the copyrights in the Works are valuable property. The Works include, but are not limited to, the Brand Standards Manuals, advertisements, promotional materials, signs, Internet sites, mobile applications, vehicle graphics, and facility designs. We authorize you to use the Works on the condition that you comply with all of the terms and conditions of this Section 11. This Agreement does not confer any interest in the Works on you, other than the right to use them in the operation of the Franchised Business in compliance with the terms of this Agreement. If you prepare any adaptation, translation or other work derived from the Works, whether or not authorized by us, you agree that the material will be our property and you hereby assign all your right, title and interest therein to us. You agree to sign any documents we deem necessary to confirm our ownership.

**11.6.** Third-Party Challenges. You agree to notify us promptly of any unauthorized use of the Marks or Works that you suspect or of which you have knowledge. You also agree to inform us promptly of any challenge to the validity of, our ownership of, or our right to license others to use any of the Marks or Works. We have the exclusive right (but no obligation) to initiate, direct and control any litigation or administrative proceeding relating to the Marks and Works, including any settlement. You agree to sign documents and render any other assistance our counsel may deem necessary to protect our interests in the Marks and the Works.

**11.7.** No Representation. Franchisor makes no representation or warranty, express or implied, as to the use, exclusive ownership, validity or enforceability of the Marks or Works.

## 12. BRAND STANDARDS MANUALS

We will furnish you with one copy of, or electronic access to, the Brand Standards Manuals. We own the copyright in the Brand Standards Manuals and any portions in your possession or control are on loan from us and remain our property. We have the right to modify the Brand Standards Manuals at any time to reflect changes in the Brand Standards. In the event of a dispute about the contents of the Brand Standards Manuals, the master copy at our principal office takes precedence. You acknowledge that the Brand Standards Manuals and any credentials necessary to access digital versions of the Brand Standards Manuals are part of the Confidential Information.

## 13. CONFIDENTIAL INFORMATION

**13.1.** Nondisclosure. You are prohibited, both during and after the term of this Agreement, from communicating or divulging Confidential Information to any unauthorized person and from using Confidential Information for your benefit or for the benefit of any other person, other than for operation of the Franchised Business. You may divulge Confidential Information only: (i) to your employees and agents who must have access in order to carry out their duties relating to the Franchised Business; and (ii) to your contractors and landlord with our prior written approval. All information that we designate as confidential will be deemed to be Confidential Information for purposes of this Agreement.

**13.2.** Individuals Affiliated with the Franchised Business. At our request, the Owners, Key Person, and any employees we designate are required to sign a separate Confidentiality and Non-Compete Agreement in the form of Appendix C to this Agreement. At our request, you are required to use best efforts

Mister Sparky **-** Franchise Agreement                                                                                                              May 2020
MS0234 – Daniel Ferguson

DocuSign Envelope ID: 0F158BB7-5506-48C4-B5F9-3E750B692416

to obtain signed confidentiality agreements from your landlord, contractors, and any other person outside of your organization to whom you wish to disclose any of our Confidential Information. The confidentiality agreements are required to be in a form satisfactory to us and identify us as a third party beneficiary with the independent right to enforce the agreement.

  **13.3.** <u>Improvements</u>. You may not introduce any Improvement into the Franchised Business without our prior written consent. Any Improvement developed by you or any Owner, employee or agent of Franchisee is the property of Franchisor. At our request, you are required to provide us with information about the Improvement and sign any documents necessary to verify assignment of the Improvement to us, without compensation. We will have the right to use, disclose, and/or license the Improvement for use by others.

## 14.  RESTRICTIONS ON COMPETITION

  **14.1.** <u>During the Term</u>. You acknowledge that the relationship established by this Agreement will provide access to valuable Confidential Information, training, and business opportunities that you and the Owners did not possess before entering into this Agreement. Accordingly, while this Agreement is in effect, except as we otherwise approve in writing, you may not, either directly or indirectly:

    **14.1.1** Own, maintain, operate, engage in, invest in, be employed by, provide any assistance to, or have any interest in any "**Competing Business**," as defined in the Brand Appendix; or

    **14.1.2** Appropriate or duplicate any part of the System for a purpose other than to operate the Franchised Business, or divert or attempt to divert any present or prospective business or customer to any Competing Business, or do anything else harmful to the goodwill associated with the Marks and the System.

  **14.2.** <u>After Expiration, Termination or Transfer</u>. You agree that you will not, for a period of two (2) years commencing on the date of: (a) a transfer permitted under Section 15 of this Agreement; (b) expiration of this Agreement; (c) termination of this Agreement (regardless of the cause for termination); or (d) a final arbitration or court order (after all appeals have been taken) with respect to enforcement of this Section 14.2 to the extent such order is later than the respective foregoing event:

    **14.2.1** Own, maintain, operate, engage in, invest in, be employed by, provide assistance to, or have any interest in any Competing Business that is located in or serves customers within (i) the Territory, (ii) forty (40) miles of the Territory, (iii) any zip code where Franchisee's Franchised Business served customers during the term, (iv) the territory of any other then-existing Franchised Businesses plus the area formed by extending the boundaries of that territory ten (10) miles in all directions, or (v) the territory serviced by any business operated by Franchisor, its affiliates or their licensees under the Marks at such time plus the area formed by extending the boundaries of that territory ten (10) miles in all directions; or

    **14.2.2** Appropriate or duplicate any part of the System for a purpose other than to operate a Franchised Business under a valid agreement with us, or divert or attempt to divert any present or prospective business or customer to any Competing Business, or do anything else harmful to the goodwill associated with the Marks and the System.

  **14.3.** <u>Enforcement</u>.

    **14.3.1** You acknowledge that a violation of this Section 14 would result in irreparable injury for which no adequate remedy at law may be available. You consent to the issuance of an injunction,

Mister Sparky - Franchise Agreement              May 2020
MS0234 – Daniel Ferguson

EX. A - 24

without the need to post bond, prohibiting any violation of this Section 14. Injunctive relief is in addition to any other remedies we may have.

**14.3.2** Neither you nor any person bound by the restrictions of this Section 14 may circumvent the restrictions by engaging in prohibited activity indirectly through any other person or entity.

**14.3.3** For the individuals who are bound personally by the restrictions in this Section 14 or by a separate non-competition agreement with you or us, the time period in Section 14.2 will run from the expiration, termination, or transfer of the Franchised Business or from the end of the individual's relationship with Franchisee, whichever occurs sooner.

**14.3.4** The time periods in Section 14.2 and Section 14.3.3 will be tolled for any period of time during which Franchisee or the restricted individual is in breach of the section and will resume only when Franchisee or such person begins or resumes compliance.

**14.3.5** The existence of any claim Franchisee or any Owner may have against Franchisor or its affiliates, whether or not arising under this Agreement, shall not constitute a defense to Franchisor's enforcement of the restrictions in this Section 14 or any separate confidentiality or non-competition agreement.

**14.3.6** You acknowledge and agree that Franchisee and each of its Owners possess skills and abilities of a general nature that provide them with other opportunities for employment and, therefore, our enforcement of the restrictions in Sections 14.2 and 14.3.3 will not deprive Franchisee or any of its Owners of their personal goodwill or ability to earn a living through alternative means.

**14.3.7** We have the right to reduce the scope of any restriction in this Section 14, effective immediately upon written notice to Franchisee.

## 15.    SALE OR ASSIGNMENT

**15.1.** <u>No Transfer of Interest without Our Consent</u>. We have entered into this Agreement in reliance on the business skill, financial capacity, and personal character of Franchisee and its Owners. Accordingly, neither Franchisee nor the Owners may sell, assign, give away, pledge, or encumber, either voluntarily or by operation of law (such as through divorce or bankruptcy proceedings) any direct or indirect interest in this Agreement, in the assets of the Franchised Business, or in the equity ownership of Franchisee without obtaining our prior written consent. This section applies to any transfer that would occur by any mechanism, including but not limited to family financial planning, estate planning, corporate reorganization, issuance or offering of securities, employee ownership plans, divorce, new marriage, bankruptcy, or receivership. If Franchisee is a corporation, limited liability company, or other business entity, this Section also applies to the transfer of a direct or indirect ownership interest in Franchisee. We can approve or disapprove the proposed transferee in our sole discretion. If we approve the proposed transferee, we can still impose conditions on the transfer. Franchisee and the Owners agree that the conditions in Sections 15.2 through 15.7 below are reasonable and that they do not preclude other conditions that we may impose. Franchisee and the Owners agree to notify us in writing of each proposed transfer, to provide all information and documentation relating to the proposed transfer that we request, and to refrain from completing the transfer until we advise you that all requirements of this Section 15 have been satisfied. If we have not responded within sixty (60) days after receiving all requested information, we will be deemed to have refused consent. We have the right to communicate with and counsel Franchisee, the Owners, and the proposed transferee on any aspect of a proposed transfer. Unless otherwise agreed, we do not waive any claims against the transferring party if we approve the transfer. If we do not approve the transfer, you are required to continue to operate the Franchised Business in accordance with this Agreement.

23

**15.2.** <u>Transfer of Business</u>. The conditions set forth in this Section apply to a proposed transfer of this Agreement and/or substantially all of the assets of the Franchised Business, as well as to a proposed transfer, alone or together with other previous, simultaneous or proposed transfers, of any direct or indirect equity ownership interest in Franchisee that would result in a change of control of Franchisee or the Franchised Business (**"Change of Control"**). Unless waived by Franchisor, the conditions are:

**15.2.1** Franchisee and the Owners are required to be in compliance with all obligations to us under this Agreement and any other agreement with us and our affiliates as of the date of the request for our approval of the transfer, or make arrangements satisfactory to us to come into compliance by the date of the transfer.

**15.2.2** The proposed transferee is required to:

(a)     Demonstrate to our satisfaction that the proposed transferee and its owners and managers meet all of our then-current qualifications to become a franchisee of the Brand, which may include educational, managerial, and business standards; absence of involvement with Competing Businesses; good moral character, business reputation, and credit rating; and aptitude and ability to operate the Franchised Business. If the proposed transferee is already a franchisee of the Brand, that fact does not guarantee approval to become the operator of the Franchised Business. We have no less discretion with respect to a proposed transferee than we have with granting a new franchise.

(b)     At our option, sign our then-current standard form of Franchise Agreement (or the standard form most recently offered to new franchisees) and related documents. The new Franchise Agreement may include new or increased fees and may otherwise differ, without limitation, from the terms of this Agreement.

(c)     Require all owners of a beneficial interest in the transferee to sign our then-current form of Personal Guarantee and our other then-current standard documents.

(d)     Successfully complete our then-current training requirements.

(e)     Make arrangements to modernize and upgrade the Franchised Business, at the transferee's expense, to comply with our then-current Brand Standards.

(f)     If the proposed transferee is another franchisee of the Brand, the proposed transferee is required to not have any outstanding notice of default under any agreements with us, have a good record of customer service and compliance with Brand Standards, and sign a general release in a form acceptable to us.

**15.2.3** Franchisee is required to pay us a transfer fee of $10,000 ("**Transfer Fee**"). If the proposed transferee had been referred to you or us by a third-party (e.g., a broker) with whom we have a referral arrangement, then we must receive as a condition of approval, an additional fee equal to the amount owed under that referral arrangement. If we identify the prospective purchaser, then in addition to the Transfer Fee, we must receive the greater of: (a) $15,000; (b) three percent (3%) of the total purchase price; or (c) our actual costs to identify the prospective purchaser. Any amounts paid pursuant to this Section are non-refundable.

**15.2.4** Franchisee and all Owners are required to sign a general release, in a form satisfactory to us, of all claims against us and our past, present and future affiliates, officers, directors, shareholders, agents and employees. Franchisee and the Owners will remain liable to us for all obligations arising before the effective date of the transfer.

24

**15.2.5**   The price and other proposed terms of the transfer must not, in our judgment, have the effect of negatively impacting the future viability of the Franchised Business.

**15.2.6**   Any financing incurred in connection with the transfer is required to be expressly subordinated to the transferee's obligations to us.

**15.3.**   <u>Transfer of Minority Ownership Interest</u>. For any proposal to admit a new Owner, to remove an existing Owner, to change the distribution of ownership shown on the Data Sheet, or otherwise modify the ownership in a way that would not result in a Change of Control of Franchisee or the Franchised Business, Franchisee is required to give us advance notice and submit a copy of all documents and other information concerning the transfer that we may request. We will have a reasonable time (not less than forty-five (45) days) after we have received all requested information to evaluate the proposed transfer. We may withhold our consent or give our consent subject to the conditions in Section 15.2 that we deem to be applicable, except that, instead of a transfer fee, we will only charge (i) the applicable, then-current change of ownership fee set by Franchisor from time to time (as of the Agreement Date, it is the greater of $500 or Franchisor's external (i.e., not in-house) legal and administrative costs); plus (ii) applicable training fees for each new person that we determine needs training. Each proposed new owner is required to submit a personal application and sign a Personal Guarantee and our other then-current standard documents.

**15.4.**   <u>Transfer on Death, Incapacity or Bankruptcy</u>. If Franchisee or any Owner dies, becomes incapacitated, or enters bankruptcy proceedings, that person's executor, administrator, personal representative, or trustee is required to apply to us in writing within 3 months after the event for consent to transfer the person's interest. The transfer will be subject to Sections 15.2 through 15.6, as applicable. In addition, if the deceased or incapacitated Owner is the Key Person, we will have the right (but no obligation) to take over operation of the Franchised Business upon giving notice to the executor, administrator, personal representative, or trustee and to manage the Franchised Business until the transfer is completed. If we exercise this right, we can charge a reasonable management fee for our services. For purposes of this Section, "incapacity" means any physical or mental infirmity that will prevent the person from performing his or her obligations under this Agreement (i) for a period of thirty (30) or more consecutive days or (ii) for sixty (60) or more total days during a calendar year. In the case of transfer by bequest or by intestate succession, if the heirs or beneficiaries are unable to meet the conditions of Section 15.2, the executor may transfer the decedent's interest to another successor that we have approved, subject to all of the terms and conditions for transfers contained in this Agreement. If an interest is not disposed of under this Section 15.4 within one year after the date of death or appointment of a personal representative or trustee, we can terminate this Agreement under Section 16.1.

**15.5.**   <u>Non-Conforming Transfers</u>. Any purported transfer that is not in compliance with this Section 15 is null and void and constitutes a material breach of this Agreement, for which we may terminate this Agreement without opportunity to cure.

**15.6.**   <u>Our Right of First Refusal</u>. We have the right, exercisable within thirty (30) days after receipt of the notice of a proposed transfer required by Section 15.1, to send written notice to you that we intend to purchase the interest proposed to be transferred, except that our right of first refusal will not apply if: (i) the sale would not result in a Change of Control; or (ii) the interests would transfer only to the spouse(s) and/or adult children of the Owners. The request for approval of transfer must include a true and complete copy of the term sheet, letter of intent, proposed purchase agreement, assignment document, description of financing or other contingencies, and any other documents we deem necessary to support a prudent business decision on whether to exercise the right of first refusal. We can assign our right of first refusal to someone else either before or after we exercise it.

25

Mister Sparky - Franchise Agreement                                                                                                      May 2020
MS0234 – Daniel Ferguson

EX. A - 27

**15.6.1**  If the proposed transfer is a sale, we or our designee may purchase on the same economic terms and conditions offered by the third party. Closing on our purchase must occur within sixty (60) days after the date of our notice to the seller electing to purchase the interest. If we cannot reasonably be expected to furnish the same type of consideration as the third-party, then we may substitute the equivalent in cash. If the parties cannot agree within thirty (30) days on the equivalent in cash, you and we will jointly designate and pay the cost of an independent appraiser, and the appraiser's determination will be final. We will have thirty (30) days after receipt of the appraiser's determination to decide whether to proceed with the purchase. We are entitled to receive, and Franchisee and the Owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the capital stock of an incorporated business, as applicable. Any material change in the third party's offer after we have elected not to purchase the seller's interest will constitute a new offer subject to the same right of first refusal as for the third party's initial offer.

**15.6.2**  If a transfer is proposed to be made by gift, you and we will jointly designate, at our expense, an independent appraiser to determine the fair market value of the interest proposed to be transferred. We will have thirty (30) days after receipt of the appraiser's determination to decide whether to purchase the interest at the fair market value determined by the appraiser. If we decide to purchase, closing on the purchase will occur within forty-five (45) days after our notice to the transferor of our decision.

**15.6.3**  If we elect not to exercise our rights under this Section, the transferor may complete the proposed transfer after complying with Sections 15.1 through 15.4, provided that the final sale price is not less than the price at which we were entitled to purchase. If we determine that the final sale price is less than the price at which we were entitled to purchase, we may refuse to give our consent to the transfer. Closing of the transfer to the third party must occur within sixty (60) days of our election not to exercise our rights. If closing does not occur within the 60-day period, the third party's offer will be treated as a new offer subject to our right of first refusal.

**15.7.**  <u>Transfer of Development Agreement</u>. If this Agreement is associated with a Development Agreement and you propose to transfer your rights under the Development Agreement, you are required (unless we otherwise approve) to transfer this Agreement and all other Franchised Businesses developed under the Development Agreement to the same transferee in the same transaction.

**15.8.**  <u>Sale or Assignment by Franchisor</u>. We have the right to transfer or assign all or any portion of our rights or obligations under this Agreement to any person or legal entity including the operator of a competing franchise system. The assignee will expressly assume our obligations and become solely responsible for them from the effective date of assignment. We can sell our assets, sell securities in a public offering or in a private placement; merge with, acquire, or be acquired by another company; or undertake a refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring, without restriction and without affecting your obligations under this Agreement.

**16.    DEFAULT AND TERMINATION**

**16.1.**  <u>Termination without Cure Period</u>. In addition to any other rights of termination set forth in this Agreement, we will have the right to terminate this Agreement if any of the following events of default occurs, without providing you an opportunity to cure the default, effective immediately upon delivery of written notice to you:

**16.1.1**  If you do not have an Approved Location within three (3) months after signing this Agreement;

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 28

**16.1.2**  If at any time during the pre-opening training program, we conclude in our sole judgment that any person required to attend the pre-opening training program does not possess the skills necessary to properly fulfill and discharge the demands and responsibilities required by the System or this Agreement;

**16.1.3**  If you do not open the Franchised Business by the Opening Deadline;

**16.1.4**  If you close the Franchised Business for three (3) or more consecutive business days without our prior approval, express your intent to abandon the Franchised Business, or cease to operate the Franchised Business for any period in circumstances where it is reasonable to conclude that you do not intend to promptly resume operation of the Franchised Business;

**16.1.5**  If you lose the right to possession of the Approved Location, or otherwise forfeit the right to do business in the jurisdiction where the Franchised Business is located. However, if, through no fault of your own, the Franchised Business premises are damaged or destroyed by an event such that repairs or reconstruction cannot be completed within sixty (60) days thereafter, then you will have thirty (30) days after that event in which to apply for our approval to relocate and/or reconstruct the Franchised Business;

**16.1.6**  If you refuse to permit us to inspect the Franchised Business or your books, records, or accounts as provided herein;

**16.1.7**  If you do not comply with the restrictions on competition in Section 14;

**16.1.8**  If any transfer of interest in this Agreement, Franchisee, or the Franchised Business occurs that does not comply with Section 15, or if an interest is not disposed of under Section 15.4 within one year after the date of death or appointment of a personal representative or trustee;

**16.1.9**  If you misuse or disclose to any unauthorized person any contents of the Brand Standards Manuals or other Confidential Information;

**16.1.10** If you knowingly maintain false or misleading books or records, knowingly underreport sales, or knowingly submit any other false or misleading information to us;

**16.1.11** If you perpetrate common law fraud against us or any customer or supplier of the Franchised Business or knowingly permit any agent or employee of Franchisee to embezzle any funds or property of any customers, Franchisor, Franchisee, or others;

**16.1.12** If Franchisee takes, withholds, misdirects or appropriates for Franchisee's own use any funds withheld from Franchisee's employees' wages for employees' taxes, FICA, insurance, or benefits;

**16.1.13** If Franchisee or any Owner commits or is convicted of, pleads guilty to, or pleads no contest to a felony, a crime involving moral turpitude, or any other crime or offense that we believe is likely to have an adverse effect on the System, the Marks, or the goodwill associated with them. Once Franchisee or any Owner has been arrested for or formally charged with a serious criminal offense, we will have the right: (i) to require that the individual(s) charged be removed from any active role in the Franchised Business pending final disposition of the charges; and (ii) if the person(s) charged include the Key Person, to take over operation of the Franchised Business and to manage it on your behalf pending final disposition of the charges. If we exercise the right in clause (ii), we may charge a reasonable management fee for our services;

**16.1.14**  If Franchisee is insolvent or makes an assignment for the benefit of creditors; if a receiver is appointed for the Franchised Business; if execution is levied against your business assets; if a suit to foreclose any lien or mortgage is filed against you and not dismissed within sixty (60) days; or if your business entity is dissolved;

**16.1.15** If Franchisee or any Owner appears on any government list of "blocked" persons or its assets, property, or interests are "blocked" under any anti-terrorism law or similar law that prohibits us from doing business with Franchisee or the Owner;

**16.1.16** If Franchisee breaches a material provision of this Agreement that is not, by its nature, curable or that goes to the essence of the Agreement;

**16.1.17** If you do not achieve the prescribed minimum score or standard on two consecutive assessments or on three or more assessments in any five (5) year period under Section 6.21;

**16.1.18** If you fail to maintain the insurance coverage required by Section 9, or fail to provide satisfactory evidence of insurance to us within forty-eight (48) hours of our request;

**16.1.19** If you fail to contact a customer within forty-eight (48) hours after receiving a customer complaint, or fail to resolve to our satisfaction any customer complaint in the manner and within the timeframe set forth in the Brand Standards Manuals, and you do not correct such failure within seven (7) days after we deliver written notice to you;

**16.1.20** If you fail to attend our annual convention for two (2) consecutive years;

**16.1.21** If the business license for, or any other permit or license required for operation of, the Franchised Business is suspended or revoked;

**16.1.22** If you fail to conduct and keep records of a satisfactory background check on any employee as may be required by us prior to his/her hire and on a regular basis, and you fail to cure the default within 10 days after we deliver written notice to you;

**16.1.23**  If you cure a default after written notice from us and the same default occurs again within one (1) year, whether or not cured after notice; or

**16.1.24**  If you fail on three (3) or more separate occasions within any period of eighteen (18) months to submit when due reports or other data, information or supporting records, or to pay when due any amounts due to us or otherwise comply with this Agreement, whether or not such failures to comply were corrected after written notice of such failure was delivered to you.

**16.2.**   Termination for Non-Payment. If you fail to pay any monies owed to us, our affiliates or a third party supplier within seven (7) days after receipt of notice of default from us, this Agreement will terminate at the end of the 7-day period without further notice from us.

**16.3.**   Termination Following Expiration of Cure Period. Except as provided in Sections 16.1 and 16.2 and elsewhere in this Agreement, we can terminate this Agreement only by giving you written notice of termination stating the nature of the default, at least thirty (30) days before the effective date of termination. If the default is not cured within the thirty (30) day period (or such longer period as applicable law may require) this Agreement will terminate without further notice to you, effective at the end of the cure period. Any material failure to comply with the requirements imposed by this Agreement (as supplemented by the Brand Standards Manuals) will be a default under this Section 16.3.

Mister Sparky - Franchise Agreement                                                                                             May 2020
MS0234 – Daniel Ferguson

EX. A - 30

16.4. <u>Cross-Default</u>. We have the right to treat a default under any other agreement that you or an affiliate have with us or an affiliate as a default under this Agreement, subject to any applicable provisions for notice and cure set forth in the other agreement. For purposes of this section, "affiliate" means a person or business entity controlling, controlled by, or under common control with Franchisee or Franchisor, as applicable.

16.5. <u>Cross-Guarantee</u>.  In the event Franchisee or Franchisee's affiliate now holds or later acquires any interest in a Franchised Business other than the Franchised Business franchised under this Agreement, Franchisee shall unconditionally guarantee full performance and discharge of all of the franchisee's obligations under the franchise agreement for such other Franchised Business, including without limitation the payment of all royalty fees, advertising fees, and other obligations.

16.6. <u>Pre-Termination Options of Franchisor</u>. Prior to the termination of this Agreement, if you fail to pay any amounts owed to us or our affiliates or fail to comply with any term of this Agreement, then in addition to any right we may have to terminate this Agreement or to bring a claim for damages, we will have the right to take the actions set out below and continue them until you have cured the default to our satisfaction. The taking of any of the actions permitted in this Section 16.6 will not suspend or release you from any obligation that would otherwise be owed to us or our affiliates under the terms of this Agreement. We may:

16.6.1   Remove the listing of the Franchised Business from all advertising published or approved by us;

16.6.2   Prohibit you from attending any meetings or seminars held or sponsored by us or taking place on our premises;

16.6.3   Charge you the default Royalty Fee rate in Section 7.6 of this Agreement;

16.6.4   Suspend access to the Call Center, the Franchisee Portal, and any technology systems we provide to you; and/or

16.6.5   Suspend services provided to you by us or our affiliates under this Agreement, including but not limited to inspections, training, marketing assistance, and the sale of products and supplies.

16.7. <u>Step In Rights</u>. In addition to our right to terminate this Agreement, and not in lieu of such right, or any other rights we may have against you, upon a failure to cure any default within the applicable cure period (if any), we have the right, but not the obligation, to enter the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business (or designate a third party to exercise authority) until such time as we determine that the default has been cured, and you are otherwise in compliance with this Agreement. If we exercise the rights described in this Section, you are required to pay us (or our designee) a fee of up to $500 per day and reimburse us (or our designee) for all costs and overhead, if any, incurred in connection with the operation of your Franchised Business, including, without limitation, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging. If we undertake to operate the Franchised Business pursuant to this Section, you agree to indemnify and hold us (and our designees and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of our operation of the Franchised Business.

16.8. <u>Liquidated Damages</u>. If we terminate this Agreement based on your default, you are required to pay us, as liquidated damages, an amount equal to the greater of: (i) two years of Royalty Fees (calculated as your average Royalty Fees per payment period in the year preceding the termination of this

Mister Sparky - Franchise Agreement                                                                                                May 2020
MS0234 – Daniel Ferguson

EX. A - 31

Agreement, multiplied by the number of payment periods occurring in a two-year period); or (ii) $100,000 (unless a different minimum is stated in the Brand Appendix). The liquidated damages are in addition to costs and expenses that you may owe us under Section 23 (Disputes).

17.    **OBLIGATIONS UPON TERMINATION OR EXPIRATION**

17.1.    <u>Our Rights to Acquire Approved Location and Franchise Assets</u>. Upon expiration or termination of this Agreement under any circumstances, you are required to:

17.1.1    At our request, assign to us your interest in the lease or sublease for the Approved Location (or provide us with a commercially reasonable lease if you own the Approved Location). If we elect not to exercise our option to acquire the lease, you are required to make modifications or alterations to the Approved Location as necessary to comply with Section 17.2 and to distinguish the Approved Location from that of a Franchised Business.

17.1.2    At our request, sell to us such of the furnishings, fixtures, vehicles, equipment, and signs of the Franchised Business as we may designate, at fair market value, and such of the inventory and supplies on hand as we may designate, at fair market wholesale value. If the parties cannot agree on the price of any such items within thirty (30) days, we will appoint an independent appraiser, and the appraiser's determination will be final. Franchisor and Franchisee will each pay one-half of the appraiser's fees and costs. We will have thirty (30) days after receipt of the appraiser's determination to decide whether to proceed with the purchase. If we exercise our option to purchase any items, we will have the right to set off any amount due us or our affiliate from you against any payment for the items.

17.1.3    At our request, provide us with a copy of each customer agreement for the Franchised Business and any related information we request, and provide us with all other information and access necessary for us (or our designee) to continue servicing the customer and related business relationships within three (3) days from our request at no cost to us (since the Customer Data is our property). To this end, each customer agreement must include a clause providing us the unconditional right (but not an obligation) to assume (directly or through a designee) the customer agreement upon the termination or expiration of this Agreement, including all of your rights and obligations thereunder that arise from and after such assumption. Upon the expiration or termination of this Agreement, you agree to facilitate our conversations with customers to ensure an orderly transition of the business operations. You agree to pay over to us (or our designee) any amounts (or a pro rata portion of any amounts) paid to you by your customers for services that you have not yet performed.

We can exercise any or all of our options under Sections 17.1.1, 17.1.2 and 17.1.3: (a) within thirty (30) days after the expiration of the Agreement Term, in the case of expiration of this Agreement; and (b) in the case of termination of this Agreement, at any time between the date of delivery of written notice of termination and thirty (30) days after the effective date of termination (or after the arbitration or court ruling upholding the termination, if termination is contested). We may assign these options to another person or entity. To preserve the value of these options, we may issue to you, and you are required to comply with, written instructions to refrain from, delay, or reverse any of the actions required of you under Section 17.2.

17.2.    <u>De-identification</u>. Unless we have instructed you otherwise under Section 17.1.3, upon termination or expiration of this Agreement under any circumstances, you are required to:

17.2.1    Cease to operate the Franchised Business, withdraw all advertising that can be canceled, remove from the Approved Location and from service vehicles all signs, graphics, and other items that display the Marks, and make any other changes that we request to dissociate yourself, the Approved Location, and the former Franchised Business from the System;

30

**17.2.2** Either permanently deactivate or, at our request, transfer to us all domain name registrations and other accounts, profiles, pages, user names, and registrations by which you associate the Franchised Business with the Brand online or in any mobile network or other electronic marketing or communications channel, including but not limited to any social media, blog, messaging system, email domain, listserv, directory, or smart phone app, whether or not we authorized the particular usage or channel. If you do not voluntarily transfer these domain names, accounts, profiles, pages, user names, and registrations, the registrars and hosts of any such electronic marketing or communications channels may accept this Agreement as evidence of our exclusive rights in the domain names, accounts, profiles, pages, user names, and registrations and of our authority to direct their transfer on your behalf. You acknowledge that when the domain names, accounts, profiles, pages, user names, and registrations are transferred, all hosted content will also be transferred to us, including all data housed on the electronic marketing and communications channels as well as all members, friends, contacts and customers who are linked to the accounts or sites;

**17.2.3** Cease to use the Confidential Information (including the Brand Standards Manuals, Customer Data and Business Data), the Marks, the Works, and all other distinctive elements associated with the System, and return all materials in your possession or control, in any medium, that contain Confidential Information, bear any of the Marks, or constitute Works;

**17.2.4** Cancel any assumed name registration that contains any element or variation of the Marks, and furnish evidence satisfactory to us of compliance with this obligation within five (5) days after termination or expiration of this Agreement;

**17.2.5** Cease using the telephone number(s) of the Franchised Business, notify your telephone company and all listing agencies of the termination of your right to use the telephone numbers and listings for the Franchised Business, and transfer those number(s) and listings to us or our designee. If you do not voluntarily transfer these numbers and listings, we will present the signed copy of Appendix D to the telephone company and all listing agencies as evidence of our exclusive rights in the telephone numbers and directory listings and of our authority to direct their transfer on your behalf;

**17.2.6** Return to customers (or if we request, to us) all items, including keys, in your possession which relate to that particular customer;

**17.2.7** Not directly or indirectly represent yourself to the public or hold yourself out as a present or former franchisee of the Brand; and

**17.2.8** Not use any reproduction, counterfeit, copy, or colorable imitation of the Marks or the Works in connection with any other business that, in our opinion, is likely to cause confusion, mistake, or deception or to dilute our and/or our affiliates' rights in and to the Marks and the Works. You must not use any designation of origin or description or representation that falsely suggests or represents an association or connection with us.

You hereby appoint us as your attorney-in-fact to carry out the requirements of this Section 17.2 if you fail to do so within a reasonable time, which need not be more than fifteen (15) days. You agree that we will have the right to enter the Approved Location and to contact your landlord and other third parties to make any required changes that you fail to make. You agree to reimburse us on demand for any costs that we incur to carry out your obligations.

**17.3.** <u>Continuing Obligations</u>. After termination or expiration of this Agreement under any circumstances, you will remain liable to us for certain obligations. Among other things, you are required to:

31

DocuSign Envelope ID: 0F1E8BB7-5506-48C4-B5F0-3E750B692416

**17.3.1**  Promptly pay all sums owing to us and our affiliates;

**17.3.2**  Permit access to and examination of books and records as provided in Section 8 to determine any amounts due;

**17.3.3**  Protect the Confidential Information as provided in Section 13;

**17.3.4**  Comply with the post-term restrictions on competition in Sections 14.2 and 14.3; and

**17.3.5**  Indemnify us as provided in Section 20.

## 18.    BUSINESS ENTITY REQUIREMENTS

**18.1.**    Ownership Information. Franchisee and each Owner represents and warrants that the ownership information on the Data Sheet is correct and complete as of the Agreement Date and will not be changed without first obtaining our consent as required by Section 15. You are required to maintain a current list of all stockholders, general partners, limited partners, members, or other direct and indirect beneficial owners (as applicable) and furnish the list to us upon request. If any Owner is a business entity, you are required to provide all information we request concerning that business entity and its owners. Every individual or entity that owns a direct or indirect equity interest of 5% or greater in Franchisee is required to guarantee Franchisee's performance of this Agreement by executing the Personal Guarantee attached to this Agreement.

**18.2.**    Governing Documents. At our request, you are required to furnish us with copies of Franchisee's articles of incorporation, bylaws, partnership agreement, certificate of formation, limited liability company operating agreement, or other governing documents, as applicable. You are required to give us at least thirty (30) days prior written notice of any proposed amendments to your governing documents. Your governing documents must provide at all times that your activities are confined exclusively to developing and operating Franchised Businesses. If any controlling Owner is a business entity, you are required to provide similar information concerning that business entity as we may request.

**18.3.**    Control Arrangements. Any voting trust, management agreement, or other arrangement affecting the power to direct and control the affairs of Franchisee requires our prior written consent. You are required to furnish any information and documentation that we may request concerning a proposed control arrangement.

## 19.    RENEWAL

**19.1.**    Renewal Term and Conditions. You will have the option to continue the franchise relationship for one (1) additional term of ten (10) years, subject to this Section. We will require you to satisfy the following requirements as a condition of renewing the franchise relationship with us:

**19.1.1**  You are required to give us written notice of your desire to renew not less than six (6) months and not more than twelve (12) months before the Expiration Date;

**19.1.2**  You must not be in default of this Agreement or any other agreement with us, our affiliates, or our approved vendors at the time you give the notice in Section 19.1 or during the remainder of the expiring term;

32

DocuSign Envelope ID: 0F1E8BB7-550C-48C4-B5F0-3E750B692416

**19.1.3**   You are required to have a good record of customer service and of compliance with Brand Standards and your contractual obligations to us;

**19.1.4**   You are required to be on good terms with us, including but not limited to having a good working relationship for day-to-day operations and not being in litigation or other adversarial legal proceedings with us;

**19.1.5**   At our option, you will sign the then-current franchise agreement being offered to new franchisees of the Brand, except that we may or may not include a further renewal option (the **"Successor Franchise Agreement"**). The terms of the Successor Franchise Agreement may differ substantially from the terms of this Agreement, including increased fees, new fees, reconfiguration of the Territory, and higher Minimum Performance Requirements. Personal guarantees will be required per our then-current policy and our other standard documents will be required;

**19.1.6**   You are required to pay us the renewal fee specified in the Brand Appendix;

**19.1.7**   Franchisee and all Owners are required to sign a general release, in a form we prescribe, of any and all claims against us, our affiliates, and our officers, directors, shareholders and employees;

**19.1.8**   The Key Person and any employees we designate are required to successfully complete any additional or refresher training courses that we may require;

**19.1.9**   You are required to demonstrate that you have the right to remain in possession of the Approved Location for the full renewal term;

**19.1.10**   You are required to remodel, refurbish, renovate (including without limitation, as to any upgrading or refurbishing of vehicles used in the Franchised Business as may be requested by us) and/or re-equip the Franchised Business and premises to conform to our then-current Brand Standards for new Franchised Businesses before the end of the expiring term or obtain our approval of arrangements to complete the work on a schedule satisfactory to us; and

**19.1.11** The computer system and vehicle(s) used in operation of the Franchised Business must be upgraded as necessary to meet our then-current Brand Standards.

**19.2.**   <u>Your Failure to Act</u>. Your failure to give timely notice of your desire to renew will be deemed an election to decline the option in Section 19.1. IN FRANCHISOR'S SOLE DETERMINATION, FRANCHISEE MAY BE DEEMED TO HAVE IRREVOCABLY DECLINED TO CONTINUE THE FRANCHISE RELATIONSHIP IF FRANCHISEE FAILS TO SIGN AND RETURN TO FRANCHISOR THE SUCCESSOR FRANCHISE AGREEMENT AND OTHER DOCUMENTS REQUIRED BY FRANCHISOR WITHIN THIRTY (30) DAYS AFTER THEIR DELIVERY TO FRANCHISEE, OR FAILS TO COMPLY IN ANY OTHER WAY WITH THE PROVISIONS OF THIS SECTION 19.

**19.3.**   <u>Holding Over</u>. If Franchisee does not sign a Successor Franchise Agreement by the Expiration Date and continues to accept the benefits of this Agreement after the expiration of this Agreement, then at the option of Franchisor, this Agreement may be treated either as (i) expired as of the Expiration Date, with Franchisee then operating without a franchise to do so and in violation of Franchisor's rights; or (ii) continued on a month-to-month basis ("**Interim Period**") until one party provides the other with written notice of such party's intent to terminate the Interim Period, in which case the Interim Period will terminate thirty (30) days after receipt of the notice to terminate the Interim Period. In the latter case, all obligations of Franchisee shall remain in full force and effect during the Interim Period as if this

Mister Sparky - Franchise Agreement                                                           May 2020
MS0234 – Daniel Ferguson

EX. A - 35

Agreement had not expired, and all obligations and restrictions imposed on Franchisee upon expiration of this Agreement shall be deemed to take effect upon termination of the Interim Period.

## 20.    INDEMNIFICATION

You agree to indemnify Franchisor, its affiliates, and their respective past, present, and future officers, directors, shareholders, employees, and agents (collectively, **"Protected Parties"**) for, and at our option defend the Protected Parties against: (i) any claims (whether or not by a third party) arising directly or indirectly from, as a result of, or in connection with your activities under this Agreement (collectively, **"Claims"**); and (ii) any liabilities, damages, losses, and expenses the Protected Parties incur as a result of such Claims, including but not limited to attorneys' fees, costs of investigation, settlement costs, fines, civil penalties, and interest charges (collectively, **"Expenses"**). To the extent permitted by law, this indemnity includes Claims and Expenses alleged to be caused by the negligence of the Protected Parties, unless (and then only to the extent that) the Claim or Expense is finally determined by a court to have been caused solely by the gross negligence or willful misconduct of the Protected Parties. With respect to any threatened or actual litigation, proceeding, or dispute that could directly or indirectly affect any of the Protected Parties, the Protected Parties will have the right, but no obligation, to: (i) choose counsel; (ii) direct, manage, and control the handling of the matter; and (iii) settle any Claim on behalf of the Protected Parties. Your obligations under this Section are not limited by the amount of your insurance coverage. This Section will survive the expiration or termination of this Agreement.

## 21.    NOTICES

All notices related to this Agreement are required to be in writing and are required to be delivered in person or sent by certified mail, by national commercial delivery service, or by other written or electronic means which affords the sender reliable evidence of delivery or attempted delivery, to the address shown in the Data Sheet, in the case of Franchisee, or to Authority Brands, LLC, 7120 Samuel Morse Drive, Suite 300, Columbia, MD 21046, Attn: Legal Department, in the case of Franchisor, unless and until a different address has been designated by written notice to the other party. For the avoidance of doubt, our delivery of notice to the business email address that we have on file for you will constitute effective notice unless we receive a non-delivery message. This Section does not apply to changes to the Brand Standards Manuals or any written instructions that we furnish to you relating to operational matters.

## 22.    GENERAL PROVISIONS

**22.1.**    <u>Notice of Suit</u>. You are required to notify us promptly of any legal proceeding or any order of a court or government agency that may adversely affect the operation or financial condition of the Franchised Business.

**22.2.**    <u>Independent Contractor</u>. Nothing in this Agreement is intended to make Franchisor or Franchisee an agent, legal representative, subsidiary, joint venturer, partner, or employee of the other for any purpose. This Agreement does not create a fiduciary relationship between you and us. Nothing in this Agreement authorizes you to make any contract, agreement, warranty, or representation on our behalf or to incur any debt or other obligation in our name. We will not assume liability for any such action or for your acts or omissions or any claim or judgment against you. You are required to hold yourself out to the public as an independent contractor operating under this Agreement.

**22.3.**    <u>Public Notice of Independent Status</u>. Franchisee is required to conspicuously identify itself by its own company name in all dealings with customers, landlords, vendors, contractors, reporters, public officials, and employees and on all business cards, stationery, advertising, payroll forms, purchase orders and other materials.

34

**22.4.** <u>Severability</u>. If a court or government agency determines that any provision of this Agreement is invalid or contrary to applicable law, the invalidity will not impair the operation of any other provision of this Agreement that remains otherwise intelligible. The latter will continue to be given full force and effect and the invalid provision(s) will be deemed not to be a part of this Agreement.

**22.5.** <u>No Implied Waiver</u>. No failure to exercise any right reserved to us in this Agreement or to insist on your strict compliance with any obligation or condition in this Agreement, and no custom or practice of the parties, will constitute a waiver of our right to exercise any right or to demand your compliance with this Agreement. Our waiver of any particular default will not affect or impair our rights with respect to any subsequent default. Our delay or forbearance in exercising any right arising out of your breach or default will not prevent us from exercising the right, declaring any subsequent breach or default, or terminating this Agreement.

**22.6.** <u>No Implied Third Party Beneficiaries</u>. Nothing in this Agreement is intended to confer any rights or remedies on any person or legal entity other than Franchisee and us.

**22.7.** <u>No Implied Consent</u>. Whenever this Agreement requires our prior approval or consent, you are required to make a timely written request, and the approval or consent must be obtained in writing and signed by one of our officers. We make no warranties or guarantees upon which you may rely and assume no liability or obligation to you by providing any waiver, approval, consent or suggestion in connection with this Agreement.

**22.8.** <u>Survival of Obligations</u>. All obligations which expressly or by reasonable implication are to be performed, in whole or in part, after the expiration, termination, or assignment of this Agreement will survive expiration, termination, or assignment.

**22.9.** <u>Our Business Judgment</u>. Except as otherwise expressly provided in this Agreement, whenever we exercise a right and/or discretion to take or withhold an action, we can make our decision or exercise our discretion based on our judgment of what is in the best interests of the Brand at the time, even though (a) there may have been alternative decisions or actions that could have been taken; (b) our decision or the action taken promotes our own financial interest; or (c) our decision or the action may apply differently to different franchisees. In the absence of an applicable statute, we will have no liability to you for any such decision or action. If applicable law implies a duty of good faith and fair dealing in this Agreement, we and you agree that the duty does not encompass any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement.

**22.10.** <u>Relationship to Other Businesses of Franchisor and its Affiliates</u>. In fulfilling its obligations to Franchisee, and in conducting any activities or exercising any rights pursuant to this Agreement, Franchisor has the right: (i) to take into account, as it sees fit, the effect on, and the interests of, other businesses in which Franchisor and its affiliates have an interest, and on Franchisor's (and its affiliates') own activities; (ii) to share market and product research, and other proprietary and non-proprietary business information, with Franchisor's affiliates and the businesses in which they have an interest; and/or (iii) to introduce products, processes, or operational equipment used by the System into the franchised systems of Franchisor's affiliates, and to allocate new products and/or developments between and among the franchised systems, as Franchisor and its affiliates see fit. Franchisee understands and agrees that all obligations of Franchisor under this Agreement are subject to this section, and that nothing in this section shall affect in any way Franchisee's obligations under this Agreement.

**22.11.** <u>Right to Information</u>. You consent to us obtaining, using and disclosing to third parties (including, without limitation, prospective franchisees, financial institutions, legal and financial advisors), for any purpose whatsoever or as may be required by law, any financial or other information contained in

35

or resulting from information, data, materials, statements and reports received by us or our affiliates (or disclosed to us or our affiliates) in accordance with this Agreement.

**22.12.** <u>Entire Agreement</u>. This Agreement and its Appendices constitute the entire agreement between Franchisor and Franchisee and the Owners concerning the Franchised Business. It supersedes all prior agreements, negotiations, representations, and correspondence concerning the same subject matter, except that nothing in this Agreement is intended to disclaim any representations made in any Franchise Disclosure Document that you received from us in connection with this Agreement. No amendment, change, or variance from this Agreement will be binding unless agreed to in writing and signed by authorized representatives of each party.

**22.13.** <u>Amendment of Prior Agreements</u>. In order to enhance consistency and quality of operation, performance, dispute resolution and other matters, we amend our standard Franchise Agreement from time to time. As a result, this Agreement may be different from other Brand franchise agreements that Franchisee or Franchisee's affiliates may have signed in the past and may contain revised provisions regarding, among other things, modifications to the System, manner of payment of fees and late fees, duties of franchisee, protection of trademarks, status and protection of Manuals and Confidential Information, technology requirements, advertising, insurance, accounting and records, transfers, default and termination, obligations on termination, franchisee covenants, taxes, indemnification, obligations to defend, approvals and waivers, notices, construction of agreement and applicable law. To cooperate with us in the achievement of these goals and as a condition of the grant of an additional franchise, Franchisee agrees that all of Franchisee's or its affiliates' existing Brand franchise agreements with Franchisor or its affiliates are amended to match the provisions of this Agreement (if the existing franchise agreements do not already include these provisions), except with respect to the royalty fee rate, required marketing contributions and spending, other fees for which amounts are specified, territory description, Approved Location, contract term, renewal conditions, and transfer conditions set out in the prior agreements, which will remain unchanged. FRANCHISEE ACKNOWLEDGES THAT THIS SECTION AMENDS ALL OF FRANCHISEE'S EXISTING FRANCHISE AGREEMENTS WITH FRANCHISOR AND THAT THE AMENDMENT WILL SURVIVE THE EXPIRATION OR TERMINATION OF THIS AGREEMENT.

**22.14.** <u>Material Modification – for California Locations Only</u>. If Franchisee or Franchisee's affiliates previously entered into one or more franchise agreements with Franchisor for a Franchised Business in California, Section 22.13 may constitute a material modification of those existing franchise agreements under California law. If that is the case, then with respect to each existing franchise agreement for a Franchised Business in California, Franchisee acknowledges having received Franchisor's Franchise Disclosure Document, which included a copy of this Agreement containing the material modifications, at least five (5) business days before signing this Agreement. If Franchisee notifies Franchisor in writing within five (5) business days after signing this Agreement that Franchisee (or Franchisee's affiliate, as applicable) rescinds this modification of the existing franchise agreement(s) for the Franchised Business in California, this Franchise Agreement will be null and void and Franchisee will not have the right to develop a Franchised Business under this Franchise Agreement.

## 23.    DISPUTES

**23.1.**    <u>Governing Law</u>. This Agreement and the relationship between Franchisor and Franchisee and the Owners is governed by the laws of the State of Maryland, except that if a provision of this Agreement would not be enforceable under the laws of Maryland, and if the Franchised Business is located outside of Maryland and the provision would be enforceable under the laws of the state in which the Franchised Business is located, then that provision will be governed by the laws of the state in which the Franchised Business is located. In the event of any conflict of law question, the laws of Maryland will prevail, without regard to the application of Maryland conflict-of-law rules. This Section 23.1 is not

Mister Sparky - Franchise Agreement                                                                                    May 2020
MS0234 – Daniel Ferguson

EX. A - 38

intended to subject this Agreement or our relationship with you to any Maryland statute or regulation that would not apply by its own terms without considering this Section.

   **23.2.**   <u>Mandatory Arbitration</u>. Except as set forth in Sections 23.3 and 23.4 below and in subsection 23.2.5, any claim or dispute arising out of or relating to this Agreement (including but not limited to any claim that the Agreement or any of its provisions is invalid, illegal, or otherwise voidable or void), the relationship between you, your owners and affiliates and us or our affiliates, or your operation of the Franchised Business, shall be submitted to JAMS for mandatory, final and binding arbitration. The arbitration will be conducted in accordance with the Federal Arbitration Act, 9 U.S.C., Section 1, *et seq.*, and the commercial arbitration rules of JAMS in effect at the time of filing of the demand for arbitration (the "**JAMS Rules**"), except as the JAMS Rules may be modified by the following:

   **23.2.1**   The seat of arbitration will be the JAMS office closest to Columbia, Maryland, and all arbitration hearings shall take place at that office. We have the right to designate headquarters for the Brand at a location other than Columbia, Maryland and to substitute that location for Columbia, Maryland for purposes of this section.

   **23.2.2**   The arbitration will be conducted, heard and decided by one (1) arbitrator ("**Arbitrator**") who is mutually agreeable to the parties. If the parties have not agreed on the Arbitrator within thirty (30) days after filing of the arbitration demand with JAMS, the Arbitrator shall be appointed in accordance with the JAMS Rules.

   **23.2.3**   The Arbitrator shall not entertain or permit any class or consolidated proceeding.

   **23.2.4**   The administrative fees of JAMS and the Arbitrator's fees will be split equally between Franchisor and Franchisee.

   **23.2.5**   If either party fails to pay its share of any fee required by JAMS to proceed with administration of the arbitration, and if the other party has paid its own share of the fee, the Arbitrator shall enter a default judgment in favor of the latter party. If an Arbitrator has not yet been appointed at the time of the non-payment of the required fee, the party that has paid its own share of the fee shall have the option to have a default judgment entered in its favor or to proceed in court on the claims submitted to arbitration.

   **23.2.6**   The Arbitrator will not have the authority to add to, delete, or modify the terms of this Agreement. All findings, judgments, decisions and awards of the Arbitrator will be limited to the claims set forth in the arbitration demand and any counterclaims, as they may be amended, and the Arbitrator will not have the authority to decide any other claims. The Arbitrator will have the power to decide any or all of the issues, claims and defenses presented in the arbitration through summary judgment, summary disposition, or dismissal proceedings without a full evidentiary hearing or witness testimony, as long as all parties are permitted to submit memoranda and affidavits and have oral argument, either in person or by telephone, if the Arbitrator determines that oral argument would assist in the decision making process. The Arbitrator will not have the right or authority to award punitive damages to any party. All findings, judgments, decisions and awards by the Arbitrator will be in writing and will be made within sixty (60) days after the arbitration hearings have been completed, and will be final and binding on all parties in the arbitration.

   **23.2.7**   The written decision of the Arbitrator will be deemed to be an order, judgment and decree and may be entered as such in any court of competent jurisdiction.

   **23.2.8**   The decision of the Arbitrator will have no collateral estoppel effect with respect to a controversy with any person or entity who is not a party to the arbitration proceeding.

37

**23.3.**    Provisional or Declaratory Relief. Nothing in Section 23.2 or elsewhere in this Agreement prohibits Franchisor's right to seek a restraining order, preliminary injunction, specific performance or declaratory relief in court, under the applicable court rules, against conduct or threatened conduct for which no adequate remedy at law may be available or which Franchisor believes may cause Franchisor irreparable harm.  Franchisor may have such relief without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law. Franchisee and each of its Owners acknowledges that any violation of (without limitation) Sections 11, 12, 13, 14, 15 or 17 would result in irreparable injury to Franchisor for which no adequate remedy at law may be available. Accordingly, Franchisee and each of its Owners consents to the issuance of an injunction at Franchisor's request (without posting a bond or other security) prohibiting any conduct in violation of any of those Sections. Franchisee's sole remedy in the event of the entry of specific performance or injunction order will be the dissolution of the order, if warranted (all claims for damages by reason of the wrongful issuance of any such order being expressly waived by Franchisee). Franchisee agrees that the existence of any claims Franchisee or any of its Owners may have against Franchisor, whether or not arising from this Agreement, will not constitute a defense to the enforcement of Sections 11, 12, 13, 14, 15 or 17.

**23.4.**    Disputes Not Subject to Mandatory Arbitration. Notwithstanding Section 23.2, Franchisor shall have the option to submit to a court any of the following actions: to collect fees due under this Agreement; for injunctive or other relief as described in Section 23.3; to protect our intellectual property, including the Marks, Confidential Information, and trade secrets; to terminate this Agreement for a default; and to enforce the post-term obligations in Section 17 of this Agreement. Notwithstanding anything in this Agreement, in the JAMS Rules, or any provision of law, the determination of whether a dispute or controversy filed in a court is subject to arbitration shall be made by the court, not by an arbitrator.

**23.5.**    Time Limit on Filing. Except for claims arising from Franchisee's non-payment or underpayment of amounts Franchisee owes Franchisor or from performance or non-performance of Franchisee's obligations arising upon expiration or termination of this Agreement, any claim or action arising out of or relating to this Agreement or the relationship between us and Franchisee and the Owners will be barred unless submitted to arbitration or filed in court and served within two (2) years from the date the complaining party knew or should have known of the facts giving rise to such claim.

**23.6.**    Venue for Litigation. Franchisee and the Owners are required to file any lawsuit against us only in the federal district court for the district encompassing Columbia, Maryland (or in the closest state court to Columbia, Maryland, if the federal court lacks subject matter jurisdiction). We may file a lawsuit against Franchisee or the Owners in the federal or state court for Columbia, Maryland or in the federal or state court where the Franchised Business is located. We have the right to designate headquarters for the Brand at a location other than Columbia, Maryland and to substitute that location for Columbia, Maryland for purposes of this section. The parties irrevocably submit to the jurisdiction of such courts and waive all objections to personal jurisdiction and venue for purposes of carrying out this provision.

**23.7.**    Waiver of Jury Trial. We, you, and the Owners irrevocably waive trial by jury in any action, proceeding, or counterclaim.

**23.8.**    Waiver of Exemplary Damages. Franchisee and the Owners, on the one hand, and Franchisor on the other, waive any right to or claim of punitive or exemplary damages against the other, except that we do not waive our right to: (i) statutory, punitive or exemplary damages for violation of the Lanham Act, trademark infringement or dilution, or unauthorized disclosure of confidential information or trade secrets; or (ii) indemnification from Franchisee under Section 20 for any such damages claimed or awarded against Protected Parties.

Mister Sparky **-** Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 40

**23.9.**  Class Action Waiver. TO THE EXTENT PERMITTED BY LAW, FRANCHISEE AND THE OWNERS WAIVE THE RIGHT TO SEEK CERTIFICATION OF A CLASS IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM AGAINST US.

**23.10.**  Costs and Legal Fees. In connection with any failure by Franchisee to comply with this Agreement, regardless of whether there is any legal proceeding to enforce the terms of this Agreement, Franchisee will reimburse Franchisor, upon demand, for the costs and expenses incurred by Franchisor as a result of such failure and Franchisor's enforcement of the terms of this Agreement. Franchisor's costs and expenses include, without limitation, accountants', attorneys', attorneys' assistants and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses, and travel expenses. If Franchisee initiates a legal proceeding against Franchisor, and if Franchisee does not prevail in obtaining the relief Franchisee was seeking in such legal proceedings, then Franchisee will reimburse Franchisor for the costs and expenses incurred by Franchisor as a result of such legal proceedings, including, without limitation, accountants', attorneys', attorneys' assistants and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel expenses, whether incurred prior to, in preparation for, in contemplation of, or in connection with such legal proceedings. However, in case of any conflict between this Section and Section 23.2.4 or 23.2.7 above, Section 23.2.4 or 23.2.7 will take precedence. This section will survive termination or expiration of this Agreement.

**23.11.**  Remedies are Cumulative. Except as otherwise provided in this Section 23, no right or remedy under this Agreement is exclusive of any other right or remedy.

**FRANCHISOR:**

Mister Sparky Franchising, L.L.C.

By: _Mark Dawson_
453AD1CC6F194E5...

Name: _Mark Dawson_

Title: _Chief Operating Officer_

Date: _December 10, 2020_

**FRANCHISEE:**

Daniel Ferguson

By: _Daniel Ferguson_
D359EBEF4A3441A...

Name: _Daniel Ferguson_

Title: _Owner_

Date: _December 10, 2020_

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 41

## PERSONAL GUARANTEE

As an inducement to **Mister Sparky Franchising, L.L.C.** (**"Franchisor"**) to sign a Franchise Agreement (the **"Agreement"**) with Daniel Ferguson (**"Franchisee"**), the undersigned individuals (collectively, the **"Guarantors"**), jointly and severally, unconditionally guarantee to Franchisor, its affiliates, and their successors and assigns (collectively, the **"Franchisor Group"**) that all of Franchisee's obligations under the Agreement and under other agreements or arrangements between Franchisee and the Franchisor Group will be punctually paid and performed.

1.      Guarantee. Upon demand by Franchisor, the Guarantors will immediately make each contribution or payment required of Franchisee under the Agreement and under other agreements or arrangements between Franchisee and the Franchisor Group. Each Guarantor waives any right to require the Franchisor Group to: (a) proceed against Franchisee or any other Guarantor for any contribution or payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee or any other Guarantor; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee or any other Guarantor. Without affecting the obligations of the Guarantors under this Guarantee, the Franchisor Group may, without notice to the Guarantors, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The Guarantors waive notice of amendment of the Agreement and notice of demand for contribution or payment and agree to be bound by any and all such amendments and changes to the Agreement.

2.      Indemnity. The Guarantors agree to hold harmless, defend and indemnify the Franchisor Group against any and all losses, damages, liabilities, costs, and expenses (including attorneys' fees, costs of investigation, court costs, and arbitration fees and expenses) arising out of or in connection with any failure by Franchisee to perform any obligation under the Agreement or any other agreement between Franchisee and the Franchisor Group.

3.      Other Personal Obligations. The Guarantors acknowledge and agree to be bound personally by all obligations of the Franchisee in the Agreement, including but not limited to non-compete restrictions, confidentiality provisions, governing law and dispute resolution provisions, and restrictions on sale or transfer of interest in Franchisee or the Franchised Business. Except as expressly authorized by the Agreement, the Guarantors may not make use of any of the intellectual property rights licensed under the Agreement. The Guarantors may not disclose to any third party or make use of any trade secrets, know-how, systems or methods of which Guarantors may acquire knowledge by virtue of training they may have received from Franchisor, their involvement in the business, or their ownership interest in Franchisee.

4.      Survival of Obligations. Upon the death of a Guarantor, the Guarantor's estate will be bound by this Guarantee, but only for obligations existing at the time of death. The obligations of the surviving Guarantors will continue in full force and effect.


**GUARANTOR:**

Printed Name:  Daniel Ferguson

Signature:  Daniel Ferguson
DocuSigned by:
D359EBEF4A3441A...

Date:  December 10, 2020


Mister Sparky - Franchise Agreement                                                                May 2020
MS0234 – Daniel Ferguson

EX. A - 42

DocuSign Envelope ID: 0F1F8BB7-5506-48C4-B5F0-3E750B692416

## APPENDIX A TO FRANCHISE AGREEMENT

## DATA SHEET

| SECTION REFERENCE | SUBJECT | FRANCHISEE'S INFORMATION |
|---|---|---|
| Section 1.14 | Key Person | Daniel Ferguson |
| Section 1.16 | Opening Deadline | March 1, 2021 |
| Section 1.21 | Territory Definition | See below for map and zip codes. Territory Population: 215,714 |
| Section 7.1 | Franchise Fee | $35,592.81 calculated as follows: $33,000 Franchise Fee, plus $2,592.81 additional population fee ($165 per thousand). Payment due as follows: $8,898.20 due at the time of signing and the remainder payable in accordance with the Promissory Note executed simultaneously herewith. |
| Section 18.1 | Ownership Information | See below. For any Owner that is a business entity, attach separate page disclosing the same information for that entity |
| Section 21 | Address for Legal Notice | TBD |

Type of Business Entity (check one):     [   ] Limited Liability Company

[   ] Corporation (C Corp or S Corp)

[   ] Limited Partnership

[ X ] Other____Individual_____

State in which organized: _____N/A_____

Owner Name:                                         Ownership Percentage:

Daniel Ferguson_____          100%

List Officers and Board Directors (if corporation) or Manager(s) (if LLC): N/A

Mister Sparky - Franchise Agreement                                        May 2020
MS0234 – Daniel Ferguson

EX. A - 43

DocuSign Envelope ID: 0F158BB7-550C-48C1-B5F9-3E750B692416

**Zip Codes:**

| 89009 | 89011 | 89012 | 89014 | 89015 | 89016 | 89052 | 89053 | 89074 | 89077 |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|

**Map:**



**Initials:** MD

**Date:** December 10, 2020

Mister Sparky **-** Franchise Agreement                                    May 2020
MS0234 – Daniel Ferguson

EX. A - 44

## APPENDIX B TO FRANCHISE AGREEMENT

## BRAND APPENDIX (START-UP FRANCHISE)
### Mister Sparky®

The Franchised Business provides residential and light electrical services, including maintenance, repair and replacement services, but excluding industrial, remodeling, and construction services.

| SECTION REFERENCE | SUBJECT | APPLICABLE TERM |
|---|---|---|
| Section 3 | Expiration Date | Tenth (10th) Anniversary of the Agreement Date |
| Section 4.1 | Business Outfitting Fees | Not Applicable as of Agreement Date |
| Section 6.6 | Call Center Fee | Not Applicable as of Agreement Date |
| Section 6.18 | Customer Warranty or Guarantee | See Brand Standards Manuals |
| Section 6.19 | Minimum Performance Requirements | Starting on the third anniversary of the Original Opening Date, the Franchised Business is required to achieve annual Gross Revenue of at least $5,000 per 1,000 of population in the Territory (e.g., $500,000 per 100,000 of population) (the "**Required Annual Sales**"). <br><br> "**Original Opening Date**" means the date on which the Franchisee or any prior owner or predecessor operator of the Franchised Business first opened the Franchised Business. <br><br> You acknowledge that the Required Annual Sales formula is not meant to be, and you may not rely on it as, a representation or guarantee of the results that your Franchised Business or any particular Franchised Business will or might achieve. The Required Annual Sales formula does not predict or project your revenue or other business results. |
| Section 6.22 | Brand Programs | **UWIN Customer Complaint Resolution Program** <br><br> You are required to participate in the customer complaint resolution program offered by our affiliate, UWIN, LLC ("**UWIN**"). You are required to sign a UWIN Participation Agreement for Franchisees, the current form of which is attached to this Brand Appendix. |
| Section 6.26 | Legal/Regulatory Requirements | Some states, counties or municipalities may require that your business be owned by a master or journeyman electrician. It is your responsibility to contact your local electrician licensing board, as well as an attorney, to learn about specific industry and contractor laws and regulations applicable to the |

Mister Sparky - Franchise Agreement                                      May 2020
MS0234 – Daniel Ferguson

EX. A - 45

| SECTION REFERENCE | SUBJECT | APPLICABLE TERM |
|---|---|---|
| | | Franchised Business. |
| Section 7.2 | Royalty Fee | The Royalty Fee is six percent (6%) of Gross Revenue or $1,500 per month (the "**Minimum Royalty**"), whichever is greater. The Minimum Royalty commences one year following the earlier of the date the Franchised Business opens for business or the Opening Deadline. The Minimum Royalty may be implemented with $750 per semi-monthly payment or pursuant to another schedule.<br><br>As of the Agreement Date, the Royalty Fee is due semi-monthly, as follows: (i) the first payment is due by the 25th day of each month based on Gross Revenue from the 1st day through the 15th day of the month, and (ii) the second payment is due by the 10th day of the next month for Gross Revenue from the 16th day through the last day of the immediately preceding month. We have the right to change the payment period.<br><br>You acknowledge that the Minimum Royalty is not meant to be, and you may not rely on it as, a representation or guarantee of the results that your Franchised Business or any particular Franchised Business will or might achieve. The Minimum Royalty does not predict or project your revenue or other business results. The Minimum Royalty is simply a fixed dollar value, the purpose of which is to guarantee a minimum economic return to us. |
| Section 7.3 | Brand Fund Contribution | Up to 4% of Gross Revenue. As of the Agreement Date, the Brand Fund Contribution is based on Gross Revenue for the calendar year: 1.5% of the first $5,000,000 of Gross Revenue in the then-current calendar year; plus 1.25% of Gross Revenue in excess of $5,000,000.00 and up to $10,000,000 in the then-current calendar year; plus 1% of Gross Revenue in excess of $10,000,000.00 and up to $15,000,000 in the then-current calendar year, plus 0.75% of Gross Revenue in excess of $15,000,000.00 and up to $20,000,000 in the then-current calendar year, and 0% with respect to Gross Revenue in excess of $20,000,000.01 in the then-current calendar year.<br><br>The rate reverts to 1.5% and resets at the start of the next calendar year.<br><br>The Brand Fund contribution will be calculated for the same period and paid in the same manner as the Royalty Fee.<br><br>We have the right to change the contribution, provided that it |

| SECTION REFERENCE | SUBJECT | APPLICABLE TERM |
|---|---|---|
| | | does not exceed 4% of Gross Revenue. |
| Section 7.4 | Technology Fee(s) | Business Software:  $325 - $525 per month as of the Agreement Date. We have the right to change this fee from time to time.<br><br>Business Software Training: $1,795 for up to two attendees; you may send two additional attendees for an additional $1,795<br><br>"Business Software" means the SuccessWare®21 software package (sometimes referred to in other documents as "SuccessWare21 (ASP Option)") for use in a cloud-hosted (Internet based) environment, or its successor or another software package designated by Franchisor in its sole and absolute discretion. |
| Section 10.3 | Pre-Opening/Grand Opening Marketing | No requirement as of Agreement Date. We recommend, but do not require, that you budget funds for pre-opening/grand opening marketing. |
| Section 10.4 | Ongoing Local Marketing Spend | We recommend, but do not require, that you spend at least 8% to 12% of Gross Revenue annually on Local Marketing. If you fail to achieve the Minimum Performance Requirements set forth in Section 6.19 for any 12 month period, you are required to spend at least 8% of Gross Revenue on Local Marketing during each of the following 12 months. |
| Section 14.1 | "Competing Business" definition | "**Competing Business**" means any business that (i) offers electrical products or services or other products or services similar to those offered by the Franchised Businesses, or (ii) grants franchises or licenses to others to operate such businesses, or (iii) is the same or substantially similar in nature or purpose to the Franchised Businesses (other than a "Mister Sparky:" business operated under a franchise agreement with us). |
| Section 16.8 | Liquidated Damages | As stated in Section 16.8 of the Agreement |
| Section 19.1.6 | Renewal Fee | $5,000 |

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 47

**APPENDIX B-1 TO FRANCHISE AGREEMENT**

**BRAND PROGRAMS**
**UWIN Customer Complaint Resolution Program**



ATTENTION FRANCHISEES


You have been approved to participate in the UWIN Customer Complaint Resolution Program. Attached is your UWIN Participation Agreement and applicable guaranty, each of which includes terms and conditions of participation.

Once UWIN receives your original, signed agreement you will be sent the UWIN Welcome Packet. You will also be added as a contractor on the UWIN website.

## UWIN PARTICIPATION AGREEMENT FOR FRANCHISEES

THIS UWIN PARTICIPATION AGREEMENT FOR FRANCHISEES, having an effective date of December 10, 2020 (the "Agreement"), is made by and between UWIN, LLC, a Florida limited liability company ("UWIN"), and the home services contractor identified on the signature page ("Contractor") who, in consideration of the promises set forth below, agree as follows:

1.    **NATURE AND SCOPE OF AGREEMENT**

   **1.1**    UWIN. UWIN is a customer service resource that provides customers information and assistance with resolution and reparations concerning their transactions with participating home services contractors (the "Customer **Complaint Resolution Program**"). Participants in the Customer Complaint Resolution Program display UWIN's distinctive seal of approval and its associated marks, logos, and designs (collectively, the "**Seal**").

   **1.2**    Contractor. Contractor is a franchisee of one of UWIN's affiliates (each, a "Franchisor") and, pursuant to its franchise agreement ("**Franchise Agreement**"), has obtained the right to use the Franchisor's system in conjunction with the operation of its home repair services business ("**Contractor's Business**"). In connection with the operation of the Contractor's Business, Contractor desires, and hereby agrees, to participate in the Customer Complaint Resolution Program.

   **1.3**    Representations and Warranties. Contractor represents and warrants to UWIN as follows:

   A.    Contractor has independently investigated the business risks involved in participating in the Customer Complaint Resolution Program and such other matters as Contractor deems important;

   B.    All information Contractor has provided to UWIN to induce UWIN to grant Contractor the right to participate in the Customer Complaint Resolution Program was true, correct, complete and accurate as of the date made, and, as of the date of this Agreement, no material change has occurred in such information;

   C.    Contractor's execution, delivery and performance of this Agreement does not violate or constitute a breach under any agreement or commitment made by Contractor;

   D.    If Contractor is a business entity, Contractor is duly organized and validly existing, is qualified to do business in each state where Contractor is or will conduct business, and is duly authorized to execute and deliver this Agreement and perform Contractor's obligations pursuant to this Agreement; and

   E.    This Agreement represents a valid, binding obligation of Contractor.

   **1.4**    Owner's Guaranty. If Contractor is a business entity, each individual with an ownership interest in Contractor (each, an "**Owner**") is required to execute an Owner's Guaranty in favor of UWIN (the form of which is attached as **Exhibit A**) and deliver the executed copy to UWIN with this signed Agreement, or if such ownership interest is acquired later, within 10 days after becoming an Owner.

## 2.    SCOPE OF PARTICIPATION

**2.1**    Participation in the Customer Complaint Resolution Program. UWIN grants Contractor the non-exclusive right to participate in the Customer Complaint Resolution Program, pursuant to the terms of this Agreement and its requirements as established by UWIN from time to time.  Contractor agrees to comply with the Customer Complaint Resolution Program and the requirements provided by UWIN from time to time, including but not limited to the use of any related written or electronic customer materials.

**2.2**    Grant of License. Subject to the terms and conditions of this Agreement, UWIN grants Contractor a non-exclusive, revocable license to use the Seal in connection with the Customer Complaint Resolution Program and Contractor's Business. Contractor accepts such grant and agrees to display the Seal on its business materials, website, advertising and marketing only in the form and manner, and only with appropriate legends and proprietary notices, as may be prescribed by UWIN from time to time. UWIN has the right (but not the obligation) to review and approve all labeling, advertising, displays and other items on which the Seal appears prior to the use of such items by Contractor. Contractor agrees to permit UWIN to inspect any materials bearing the Seal and to comply in a timely fashion with any instruction from UWIN as to the proper use of the Seal or any request to modify or discontinue any use of the Seal.

**2.3**    Term. Unless terminated earlier pursuant to **Article 5**, the term of this Agreement will be from the date of this Agreement until the expiration or termination of the Franchise Agreement ("**Term**"). During the term, if requested by UWIN, Contractor agrees to execute any then current form of UWIN's participation agreement and all other agreements then customarily used by UWIN in granting rights to use the Customer Complaint Resolution Program, which agreements may contain terms and conditions that are materially different from the terms and conditions in this Agreement.

**2.4**    Reserved Rights. UWIN reserves all rights not specifically granted to Contractor herein. This Agreement does not limit the right of UWIN to use or authorize others to participate in the Customer Complaint Resolution Program, use the Seal, or to engage in or license any business activity, including, without limitation, the operation or franchising of home repair services businesses under the Seal at any location, and/or under any other trade name, trademark or service mark now or hereafter owned by or licensed to UWIN or its affiliates at any location.

**2.5**    Modification of the Customer Complaint Resolution Program and/or Seal. The parties agree that UWIN, in its sole discretion, may change or modify the Customer Complaint Resolution Program, including the Graphics Manual and/or the Seal, from time to time. Contractor agrees to modify its operations, including any display of the Seal, to comply with the new standards established by UWIN within a reasonable time after UWIN notifies Contractor of any such change.  If such change is made, reference in this Agreement to the Customer Complaint Resolution Program and/or Seal will be deemed to refer to such new program, mark or seal.

**2.6**    Goodwill. All improvements and additions to or associated with the Customer Complaint Resolution Program, whenever and by whomever made, and all service mark and trademark registrations and goodwill at any time associated with the Customer Complaint Resolution Program, including the Seal, are the property of UWIN. All goodwill established by Contractor's use of the Seal and Customer Complaint Resolution Program will inure to the sole and exclusive benefit of UWIN. Upon expiration or termination of this Agreement, no monetary amount will be assigned or attributed to any goodwill associated with Contractor's participation in the Customer Complaint Resolution Program or use of the Seal.

**2.7**    Ownership of Customer Complaint Resolution Program. Contractor acknowledges and agrees that it will not acquire any proprietary rights in the Customer Complaint Resolution Program or the Seal by virtue of its participation in the Customer Complaint Resolution Program. Contractor agrees not to

Mister Sparky **-** Franchise Agreement                                                                                            May 2020
MS0234 – Daniel Ferguson

EX. A - 51

contest (A) UWIN's unrestricted and exclusive ownership of the Customer Complaint Resolution Program and Seal or (B) UWIN's right to grant licenses to use the Seal. Contractor acknowledges that it does not have any right to authorize others to participate in any part of the Customer Complaint Resolution Program, including any use of the Seal, and that all materials relating to the Customer Complaint Resolution Program will at all times remain the sole property of UWIN.

## 3.    CUSTOMER COMPLAINT RESOLUTION

3.1    <u>Resolution of Complaints</u>. Contractor agrees to follow, and authorizes UWIN to follow, the resolution provisions described in this Article 3 for any and all disputes which may arise between Contractor and its customers during the Term.

3.2    <u>Contractor's Resolution</u>. Contractor will use good faith efforts to resolve any and all disputes that Contractor may have with its customers and former customers regarding the material used by Contractor, the labor performed or the craftsmanship displayed by Contractor with respect to work for which it has charged or intends to charge its customers.

3.3    <u>UWIN's Intervention</u>. If a customer of Contractor notifies UWIN that a dispute exists between such customer and Contractor regarding the material used by Contractor, labor performed or the craftsmanship displayed by Contractor with respect to work for which Contractor has charged, or intends to charge, that customer (a "Customer Complaint"), UWIN will advise the customer that UWIN will promptly notify Contractor of the Customer Complaint and that Contractor will have 48 hours to resolve the Customer Complaint to customer's satisfaction.

3.4    <u>Remedial Actions</u>. If Contractor fails to resolve a Customer Complaint to the customer's satisfaction within 48 hours after receiving notice of the Customer Complaint from UWIN, UWIN, in its sole discretion and without notice to Contractor, has the right to either:

A.    pay customer the dollar amount that UWIN determines to be in dispute;

B.    pay customer the dollar amount that UWIN determines is required to complete the work, if unfinished; or

C.    pay an independent third party contractor to complete the work, if unfinished (each of these, a "**Remedial Payment**").

Contractor authorizes and directs UWIN to make any of the foregoing Remedial Payments and take such other related actions required to resolve the Customer Complaint as UWIN, in its sole discretion, deems appropriate.  Nothing herein is intended to be deemed to cause UWIN to be a guarantor or third party to Contractor's obligation to its customers and Contractor shall not represent anything to the contrary to its customers. Contractor agrees to reimburse UWIN for the full amount of any Remedial Payment made under this Section 3.4 within 15 days after UWIN notifies Contractor of such Remedial Payment. If Contractor does not reimburse UWIN for the full amount of any Remedial Payment within the 15-day period, UWIN has the right to assess and collect a past due service charge equal to the lesser of 1.5% per month or the maximum interest rate permitted by law on such past due amounts beginning from the date UWIN made the Remedial Payment. Contractor's obligations under this **Article 3** will continue after the termination or expiration of this Agreement with regard to (i) any work performed by Contractor prior to the date of termination or expiration of this Agreement and (ii) any work performed by Contractor while it is displaying the Seal, regardless of whether such work was performed prior to or after the date of termination or expiration of this Agreement.

DocuSign Envelope ID: 0F158BB7-5506-48C1-B5F0-3E750B692416

3.5 <u>Records and Reports</u>. To assist with UWIN's intervention under this **Article 3** and assistance with Customer Complaints, Contractor agrees to maintain accurate books and records and to provide UWIN with information, within 5 days after UWIN's request, in a format specified by UWIN, regarding (A) the number of service calls made by Contractor, (B) the number and description of each complaint made by a customer of Contractor, (C) the status of each complaint and the steps taken by Contractor to resolve the complaint, and (D) the amount of money, if any, paid by Contractor's customer or by Contractor to resolve the complaint.

## 4. TRANSFER

4.1 <u>Transfer by UWIN</u>. UWIN has the right, directly or indirectly, to sell, assign, transfer or otherwise dispose of this Agreement, or any or all of its rights and obligations under this Agreement, to any individual, firm, partnership, association, bank, lending institution, corporation, affiliate, limited liability company or other third party as UWIN may in its sole discretion deem appropriate. In the event of any such sale, assignment, transfer, or other disposition, UWIN will be released from any liability under this Agreement for the obligations transferred.

4.2 <u>Transfer by Contractor</u>. Contractor acknowledges that the granting of the rights hereunder is based on UWIN's investigation of Contractor's qualifications and that such rights are personal to Contractor and therefore Contractor will not sell, divide, encumber, assign, hypothecate, mortgage, sub-license, or otherwise transfer through any means any part of this Agreement or its rights or obligations hereunder. Any actual, attempted or purported transfer occurring without UWIN's prior written consent will constitute a default of this Agreement and will be null and void.

## 5. TERMINATION AND EXPIRATION

5.1 <u>Mutual Agreement.</u>  The parties may terminate this Agreement at any time upon mutual agreement.

5.2 <u>Termination by UWIN</u>. UWIN may terminate this Agreement, in its sole discretion, upon 60-day notice to Contractor.

5.3 <u>Termination by UWIN Without Opportunity to Cure</u>. Contractor will be deemed to be in default under this Agreement, and UWIN may, at its option, terminate this Agreement and all rights granted herein effective immediately, without giving Contractor notice of, or the opportunity to cure, the default, if Contractor:

A. makes (or is deemed to have made) a general assignment for the benefit of creditors, or if a petition is filed against Contractor under the Bankruptcy Code and not dismissed within 60 days of filing, or if a petition is filed by Contractor under the Bankruptcy Code, or if Contractor is declared or adjudicated bankrupt, or if a liquidator, trustee in bankruptcy, custodian, receiver, receiver and manager, moderator, or any other officer with similar powers is appointed of or for Contractor, or if Contractor commits any act of bankruptcy or institutes proceedings to be adjudged bankrupt or insolvent or consents to the institution of such appointment or proceedings, or if Contractor admits in writing an inability to pay debts generally as they become due;

B. has any of the products or chattels of Contractor's Business at any time seized or taken in execution or in attachment by a creditor of Contractor, or a writ of execution is issued against such products or chattels;

Mister Sparky - Franchise Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 53

C.         has willfully or fraudulently misrepresented any fact, condition or report made in any application given to UWIN or required to be made by this Agreement; or

D.         by its actions, or its failure to take an action that it is required to take, adversely affects the goodwill associated with the Customer Complaint Resolution Program or the Seal.

5.4        <u>Termination by UWIN After Opportunity to Cure</u>. Contractor will be deemed to be in default of this Agreement, and UWIN, at its option, may terminate this Agreement and all rights granted herein effective as of the time noted, if Contractor:

A.         fails to pay when due any monies owed to UWIN and such default is not cured within 10 days after delivery of Notice thereof from UWIN;

B.         fails to resolve one or more disputes with its customers to the satisfaction of UWIN in accordance with the Customer Complaint Resolution Program and this Agreement; or

C.         is in default of any of Contractor's other obligations contained in this Agreement or in any other agreement or instrument entered into or made between Contractor and UWIN (or one of its affiliates) relating to Contractor's Business and fails to cure such default to UWIN's satisfaction within 30 days after receiving Notice from UWIN or its affiliate to cure the same.

5.5        <u>Other Relief</u>. Any termination under **Sections 5.1, 5.2, 5.3** and **5.4** of this Agreement will be without prejudice to any other rights (including any right of indemnity), remedy or relief vested in or to which UWIN may otherwise be entitled against Contractor. All moneys paid by Contractor to UWIN under this Agreement or otherwise will be retained by UWIN as consideration for the rights and benefits previously conferred on Contractor hereunder. The foregoing remedy does not exclude any of the remedies which UWIN may have at law or in equity by reason of the default, breach or non-observance by Contractor of any provision of this Agreement.

5.6        <u>Contractor's Obligations on Termination or Expiration</u>. Upon the termination or expiration of this Agreement for any reason whatsoever, Contractor will forthwith cease to be enrolled in the Customer Complaint Resolution Program and must immediately:

A.         pay UWIN all outstanding and unpaid amounts and charges that have or will thereafter become due hereunder or under any other agreement between Contractor and UWIN, including but not limited to the amount of any Remedial Payments and/or interest on past due Remedial Payments (as described in Section 3.4 above);

B.         thereafter not, directly or indirectly, represent to the public that Contractor's Business is operated in association with UWIN or the Customer Complaint Resolution Program, or hold itself out as a present or former participant in the Customer Complaint Resolution Program;

C.         cease to use, directly or indirectly, in advertising or in any other manner whatever, the Seal, any mark similar to the Seal, or any other identifying characteristics or indicia of operation of the Customer Complaint Resolution Program;

D.         notify the telephone company, and all listing agencies displaying the Seal on Contractor's behalf, of the termination or expiration of Contractor's right to use the Seal;

E.    permit UWIN, at Contractor's expense, to enter the location from which Contractor's Business is conducted in order to remove any and all personal property of Contractor which displays the Seal or any distinctive feature or device associated with the Customer Complaint Resolution Program, including any and all equipment, signs, advertising materials, fixtures, furnishings, inventory, invoices, supplies or forms; and

F.    delete any references to UWIN or the Seal from any website used by Contractor.

## 6.    DISPUTES AMONG PARTIES AND WITH THIRD PARTIES

6.1    <u>Complaints</u>. Contractor must immediately provide UWIN with copies of any correspondence, notices or other complaints relating to the operation or activities of Contractor's Business that Contractor receives from any of its customers, any Better Business Bureau or any federal, state or local regulatory or governmental agency

6.2    <u>Infringements</u>. Contractor must give Notice to UWIN immediately upon learning of any alleged infringement or a challenge to Contractor's use of the Customer Complaint Resolution Program or the Seal, or any claim by any third party of any rights in the Customer Complaint Resolution Program, the Seal or any other mark. Contractor agrees not to communicate with any person other than UWIN or UWIN's attorneys and Contractor's attorneys in connection with any alleged infringement, challenge or claim.

6.3    <u>Disputes Concerning Customer Complaint Resolution Program</u>. UWIN has the sole right and responsibility to handle and resolve litigation, trademark office proceedings or other administrative proceedings, or other disputes with third parties (including imitators and infringers) concerning the Customer Complaint Resolution Program and/or the use of all or any part of the Seal. UWIN does not have any obligation to initiate suit against imitators or infringers, and may settle any dispute by grant of a license or otherwise. Contractor will sign all instruments and documents, provide assistance and take any action that, in the opinion of UWIN's attorneys, may be necessary or advisable to protect and maintain UWIN's interests in any litigation, trademark office proceeding or other administrative proceeding or to otherwise protect and maintain UWIN's interest in the Customer Complaint Resolution Program and/or the Seal.

6.4    <u>No Punitive, Exemplary or Consequential Damages</u>. **EXCEPT WITH RESPECT TO CONTRACTOR'S OBLIGATION TO INDEMNIFY THE INDEMNIFIED PARTIES PURSUANT TO SECTION 7.3 AND CLAIMS UWIN BRINGS AGAINST CONTRACTOR FOR CONTRACTOR'S UNAUTHORIZED USE OF THE CUSTOMER COMPLAINT RESOLUTION PROCESS OR SEAL, UWIN AND CONTRACTOR AND CONTRACTOR'S RESPECTIVE OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES AGAINST THE OTHER AND WILL BE LIMITED TO RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED.**

6.5    <u>No Jury Trial.</u> UWIN AND CONTRACTOR IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY.

6.6    <u>Attorneys' Fees</u>. The prevailing party in any litigation arising out of or relating to this Agreement will be entitled to recover from the other party all damages, costs and expenses, including court costs and reasonable attorneys' fees, incurred by the prevailing party in successfully enforcing any provision of this Agreement.

6.7    Applicable Law. This Agreement will be governed, construed and interpreted in accordance with the substantive laws of the state in which UWIN has its principal place of business at the time a dispute arises, without giving effect to its conflict of law principles.

6.8    Venue. UWIN AND CONTRACTOR AGREE THAT (A) ANY STATE COURT OF GENERAL JURISDICTION SITTING IN THE COUNTY AND STATE WHERE UWIN HAS ITS PRINCIPAL PLACE OF BUSINESS AT THE TIME THE ACTION IS COMMENCED OR (B) THE UNITED STATES DISTRICT COURT FOR THE COUNTY AND STATE WHERE UWIN HAS ITS PRINCIPAL PLACE OF BUSINESS AT THE TIME THE ACTION IS COMMENCED WILL BE THE VENUE AND EXCLUSIVE FORUM IN WHICH TO ADJUDICATE ANY CASE OR CONTROVERSY ARISING FROM OR RELATING TO THIS AGREEMENT, AND UWIN AND CONTRACTOR IRREVOCABLY SUBMIT TO THE JURISDICTION OF SUCH COURT AND WAIVES ANY OBJECTION IT MAY HAVE TO EITHER THE JURISDICTION OR VENUE OF SUCH COURT.

## 7.    RELATIONSHIP AND INDEMNIFICATION

7.1    Independent Parties. Contractor is and will at all times remain an independent contractor and is not and will not represent itself to be the agent, joint venturer, partner or employee of UWIN, or to be related to UWIN other than as a participant in the Customer Complaint Resolution Program. Contractor will not make any representations or take any acts which could establish any apparent relationship of agency, joint venture, partnership or employment with UWIN, and UWIN will not be bound in any manner whatsoever by any agreements, warranties, representations or undertakings made by Contractor to any other person nor with respect to any other action of Contractor. No acts of assistance given by UWIN to Contractor will be construed so as to alter this relationship.

7.2    Non-Liability. UWIN is not obligated or liable for any injury or death of any person or damage to any property caused by Contractor's acts, failure to act, negligence or willful conduct, or for any other liability of Contractor.

7.3    Contractor Indemnity. Contractor hereby agrees to indemnify, hold harmless and, upon request, defend UWIN, its affiliates, and their respective members, owners, shareholders, directors, officers, employees and agents (the "Indemnified Parties"), from and against all suits, proceedings, assessments, losses, claims, liabilities, demands or actions of any nature or kind whatsoever ("Claims"), directly or indirectly arising out of, or in any manner whatsoever associated or connected with:

A.    the failure of Contractor to pay when due any levies, taxes or assessments that Contractor may be required by applicable law to pay;

B.    Contractor's operation of Contractor's Business;

C.    Contractor's acts, failure to act, or negligence or willful conduct; or

D.    any failure to comply with the obligations described under this Agreement, including but not limited to Remedial Payments made under Section 3.4 and any related actions taken in connection therewith;

and against any and all damages, costs, expenses and fees (including, without limitation, reasonable legal expenses and fees), losses, fines or penalties incurred by or on behalf of any of the Indemnified Parties in the investigation or defense of any and all Claims.

## 8.    GENERAL

8.1     Inquiry by UWIN. Contractor, by its execution of this Agreement, authorizes UWIN and its agents and representatives to make credit and background checks, including, without limitation, reasonable inquiries of Contractor's bankers, suppliers and other trade creditors regarding their dealings with Contractor in relation to Contractor's Business, to discuss the affairs, finances and accounts of Contractor's Business with Contractor's bankers; and Contractor, by its execution of this Agreement, authorizes and directs such bankers, suppliers and trade creditors to discuss with UWIN and its authorized agents and representatives the affairs, finances and accounts of Contractor's Business. If requested, Contractor agrees to execute and deliver such directions and other documents as UWIN may require in order to authorize such bankers, suppliers and trade creditors to release or disclose any such information and documents to UWIN.

8.2     Notices. All notices, consents and approvals permitted or required to be given under this Agreement must be in writing and will be deemed to be sufficiently and duly given if set forth in writing and, in the case of Contractor, left with an adult person working at Contractor's Business, or, in the case of either party, if sent by a prepaid certified letter or by overnight courier service or transmitted by facsimile, electronic mail or other form of recorded communication tested prior to transmission (with a confirming copy mailed to the addresses shown on the signature page) or such other address or facsimile number provided by one party to the other party for notices. Any notice so given or made will be deemed to have been given or made and received on the earlier of (A) the day of delivery or (B) one business day after transmission by facsimile or other form of recorded communication service of the same or by overnight courier service, as the case may be, or (C) on the third business day following the day of mailing of the same by certified mail.

8.3     Approvals or Consents. Requests by Contractor for approvals or consents must be in writing and timely made. Approvals and consents by UWIN will not be effective unless in writing and duly executed by UWIN. Except as expressly provided to the contrary herein, UWIN may grant or withhold such approvals or consents, and may make any determinations permitted hereunder, in its sole discretion and will not be required to show "reasonableness" or to comply with any other standard in connection herewith.

8.4     Non Waiver. The failure of either party to exercise any right, power or option given under this Agreement, or to insist upon strict compliance with the terms and conditions of this Agreement by the other party, will not constitute a waiver of the terms and conditions of this Agreement with respect to any other or subsequent breach of this Agreement or default under this Agreement, nor a waiver by the first party of its right at any time thereafter to require strict compliance with all terms and conditions of this Agreement. UWIN's acceptance of payments due under this Agreement will not constitute a waiver of any breaches by Contractor that precede the acceptance of such payments.

8.5     Effect of Standards. UWIN's specifications of the Customer Complaint Resolution Program will not constitute a warranty or representation, express or implied, as to quality, safety, suitability, fitness for a particular purpose or any matter. UWIN will not be liable to Contractor or others on account of the specifications of the Customer Complaint Resolution Program.

8.6     Further Assurances. The parties agree to diligently do or cause to be done all acts or things and to execute all documents and instruments necessary to implement and carry into effect this Agreement to its fullest extent.

8.7     Successors and Assigns. This Agreement will inure to the benefit of and be binding upon UWIN, Contractor and their respective heirs, legal representatives, successors and permitted assigns.

8.8     No Third-Party Beneficiaries. Except as otherwise expressly provided herein, this Agreement is exclusively for the benefit of the parties hereto and does not confer a benefit on, or give rise to liability to, a third party. No agreement between UWIN and a third party is for the benefit of Contractor.

8.9     Construction. Contractor acknowledges that it had the opportunity to be represented by an attorney in connection with the execution of this Agreement, and to review and understand the terms hereof and to consider the advisability of entering into this Agreement. This Agreement will be construed according to its plain meaning and neither for nor against either party hereof regardless of which party's counsel drafted the provision.

8.10    Entire Agreement/Amendments. UWIN and Contractor each acknowledge and warrant to each other that they wish to have all terms of the business relationship defined in this Agreement. Neither UWIN nor Contractor wishes to enter into a business relationship with the other in which any terms or obligations are the subject of alleged oral statements or in which oral statements serve as the basis for creating rights or obligations different from or supplementary to the rights and obligations set forth herein. Accordingly, UWIN and Contractor agree that this Agreement, together with any other documents or agreements executed by the parties contemporaneously hereto, supersede and cancel any prior and/or contemporaneous discussions (whether described as representations, inducements, promises, agreements or any other term) between UWIN or anyone acting on its behalf and Contractor or anyone acting on its behalf, which might be taken to constitute agreements, representations, inducements, promises or understandings (or any equivalent to such terms) with respect to the relationship between the parties, and UWIN and Contractor each agree that they have placed, and will place, no reliance on any such discussion. This Agreement, together with any other documents or agreements executed by the parties contemporaneously hereto or incorporated herein by reference, constitutes the entire agreement between the parties and contains all of the terms, conditions, rights and obligations of the parties with respect to any aspect of the relationship between the parties. No further rights or offer of rights have been promised to Contractor and no such rights or offer of rights will come into existence, except by means of a separate writing, executed by an officer of UWIN or such other entity granting the rights and specifically identified as a modification of this Agreement. No change, modification, amendment or waiver of any of the provisions hereof will be effective and binding upon either party unless it is in writing, specifically identified as an amendment hereto and signed by the party to be charged.

8.11    Survival. All obligations of UWIN and Contractor which expressly or by their nature survive termination or expiration or transfer of this Agreement, including but not limited to the Remedial Payment obligations in Article 3, the dispute resolution provision in Article 6, and the Relationship and Indemnification provisions of Article 7 will continue in full force and effect subsequent to and notwithstanding such termination or expiration or transfer and until they are satisfied or by their nature expire. Notwithstanding the foregoing, nothing in this Agreement is intended to disclaim any express representations made by Franchisor in any Franchise Disclosure Document.

8.12    Severability of Provisions. Every part of this Agreement is severable and the invalidity or unenforceability of any part of this Agreement will not affect the validity or enforceability of any other part of this Agreement.

8.13    Counterparts. This Agreement may be executed in counterparts, and each counterpart when so executed and delivered will be deemed an original.

9.    ACKNOWLEDGEMENTS

9.1     Control of Contractor's Business. Contractor understands and acknowledges that UWIN will not be exercising any control over its method of operations or give Contractor any significant assistance

Mister Sparky - Franchise Agreement                                                          May 2020
MS0234 – Daniel Ferguson

EX. A - 58

in the day-to-day operations of its home repair services business. Specifically, UWIN has no control over and no obligation to provide any assistance with respect to any of the following activities: site approval or selection; site design or appearance; hours of operation; service techniques; account or management policies and practices; personal policies or practices; promotional campaigns; service or marketing territories; and training programs.

   **9.2**  <u>Contractor Business Trademark</u>. Contractor acknowledges that, notwithstanding the license of the Seal under this Agreement, the Contractor's Business will primarily be associated with Contractor's name, trademarks, and logos and not substantially associated with the Seal. Contractor's display and use of the Seal will be in connection with its participation in the Customer Complaint Resolution Program and not the overall operation of its home repair services business. Contractor's Business will not be operated under a marketing plan or system prescribed in substantial part by UWIN.

   **9.3**  <u>Contractor's Business Operation</u>. Contractor acknowledges that it is not relying on UWIN to furnish any advice, guidance, or assistance with respect to the established or continuing operation of its home repair services business in the form of marketing assistance or advice or any other business assistance, although UWIN may give Contractor assistance from time to time.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as dated below.

**Contractor Name:** Daniel Ferguson

By: *Daniel Ferguson*

Name: Daniel Ferguson

Title: Owner

Date: December 10, 2020

**UWIN, LLC**

By: *Mark Dawson*

Name: Mark Dawson

Title: Chief Operating Officer

Date: December 10, 2020

Check One:

  **X** an Electrical Contractor
  an HVAC Contractor
  a Plumbing Contractor

Located at:
  **TBD**

UWIN, LLC
7120 Samuel Morse Drive
Suite 300
Columbia, MD 20746
Attention: Membership Services

## UWIN OWNER'S GUARANTY

In consideration of, and as an inducement to, the grant of a license to use the Seal and the execution of the UWIN Agreement for Franchisees, (the "Agreement") by and between UWIN, LLC, a Florida limited liability company ("UWIN"), and Daniel Ferguson, ("Contractor"), the undersigned owner of Contractor ("Owner") hereby personally and unconditionally: (1) guaranties to UWIN and its successors and assigns, for the Term and thereafter, including any renewal, as provided in the Agreement, that Contractor will punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and any documents, agreements, instruments and promissory notes executed pursuant to or in connection with the Agreement (collectively, the "Documents"); and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Documents applicable to Owners of Contractor.

The undersigned waives:

1. acceptance and notice of acceptance by UWIN of the foregoing undertakings;

2. notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guarantied;

3. protest and notice of default to any party with respect to the indebtedness or non-performance of any obligations hereby guarantied;

4. any right the undersigned may have to require that an action be brought against Contractor or any other person as a condition of liability; and

5. any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

The undersigned consents and agrees that:

1. the undersigned's direct and immediate liability under this Guaranty will be joint and several with all signatories to this and similar guaranties of Contractor's obligations;

2. the undersigned agrees to render any payment or performance required under the Agreement upon demand if Contractor fails or refuses punctually to do so;

3. this Guaranty applies to any claims UWIN may have due to return of any payments or property UWIN may have received from Contractor as a preference, fraudulent transfer or conveyance or the like in any legal proceeding;

4. such liability is not contingent or conditioned upon pursuit by UWIN of any remedies against Contractor or any other person; and

5. such liability will not be diminished, relieved or otherwise affected by any extension of time, creditor or other indulgence which UWIN may from time to time grant to Contractor or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable

Mister Sparky - Franchise Agreement                                          May 2020
MS0234 – Daniel Ferguson

EX. A - 60

during and after the terms of the Documents, as the same may be amended or renewed, until Contractor's duties and obligations to UWIN are fully discharged and satisfied.

All capitalized terms used in this Guaranty and not otherwise defined will have the meanings ascribed to them in the Agreement.

This Guaranty will be governed, construed and interpreted in accordance with the substantive laws of the state where UWIN has its principal place of business at the time the dispute arises, without giving effect to its conflicts of law principles. Owner agrees that (A) any state court of general jurisdiction sitting in the county and state where UWIN has its principal place of business at the time the action is commenced or (B) the United States District Court for the county and state where UWIN has its principal place of business at the time the action is commenced will be the venue and exclusive forum in which to adjudicate any case or controversy arising from or relating to this Guaranty, and Owner irrevocably submits to the jurisdiction of such court and waives any objection it may have to either the jurisdiction or venue of such court.

IN WITNESS WHEREOF, each of the undersigned has affixed his or her signature as dated below.

**GUARANTOR(S):**

DocuSigned by:

*Daniel Ferguson*

D359EB Signature

Daniel Ferguson

Print Name

December 10, 2020

Date

## APPENDIX C TO FRANCHISE AGREEMENT

## CONFIDENTIALITY AND NON-COMPETE AGREEMENT

Daniel Ferguson (**"Franchisee"**) has entered into a Franchise Agreement (the **"Franchise Agreement"**) with Mister Sparky Franchising, L.L.C.  (**"Franchisor"**). Under the Franchise Agreement, Franchisor can require certain individuals affiliated with the Franchisee to bind themselves personally to the confidentiality obligations and restrictions on competition in the Franchise Agreement. You agree as follows:

1.      You are signing this Agreement for the benefit of both Franchisee and Franchisor, as a condition of your employment by, ownership interest in, or other role with Franchisee. Franchisor has the right to enforce this Agreement directly against you.

2.      You will or might gain access to Confidential Information (as defined in the Franchise Agreement) as a result of your role with Franchisee. You agree that you will:  (a) not use the Confidential Information in any other business or capacity; (b) use your best efforts to maintain the confidentiality of the Confidential Information; and (c) not make unauthorized copies of any Confidential Information. If your relationship with Franchisee ends, these obligations continue, but you are required to return to Franchisor any materials in your possession or control that contain Confidential Information.

3.      While the Franchise Agreement is in effect and you continue in your role with Franchisee, you will not, directly or indirectly (such as through an affiliate or a family member) own, operate, engage in, be employed by, provide assistance to, or have any economic interest in any Competing Business. **"Competing Business"** has the same meaning as set forth in the Brand Appendix to the Franchise Agreement.

4.      For two (2) years after (i) your relationship with Franchisee ends; (ii) the expiration or termination of the Franchise Agreement; or (iii) the approved transfer of the Franchise Agreement to a new franchisee, whichever comes first, you will not, without Franchisor's consent (which Franchisor may withhold at its discretion) either directly or indirectly (such as through an affiliate or a family member) own, operate, engage in, be employed by, provide assistance to, or have any economic interest in any Competing Business that is located in or serves customers within (i) the Territory defined in the Franchise Agreement, (ii) forty (40) miles of the Territory, (iii) any zip code where Franchisee's Franchised Business served customers while the Franchise Agreement was in effect, (iv) the territory of any other then-existing Franchised Businesses  plus the area formed by extending the boundaries of that territory ten (10) miles in all directions, or (v) the territory serviced by any business operated by Franchisor, its affiliates or their licensees under the Marks plus the area formed by extending the boundaries of that territory ten (10) miles in all directions. The time period above will be tolled for any period of time during which you are in breach of this section and will resume only when you begin or resume compliance.

5.      You acknowledge that enforcement of the restrictions contained in Paragraphs 3 and 4 will not deprive you of the ability to earn a living. If a court rules that any of these restrictions is unenforceable by virtue of its scope or in terms of geographic area, type of business activity prohibited, and/or length of time, you agree to comply with any lesser restriction deemed enforceable by the court. If Franchisor or Franchisee initiates a legal proceeding to enforce this Agreement and prevails in the proceeding, you agree to reimburse Franchisor or Franchisee for its enforcement costs and expenses, including attorneys' fees.

**FRANCHISEE/YOU:**

DocuSigned by:

*Daniel Ferguson*

Daniel Ferguson

Mister Sparky - Franchise Agreement                                                                    May 2020
MS0234 – Daniel Ferguson

EX. A - 62

**APPENDIX D TO FRANCHISE AGREEMENT**

**TELEPHONE NUMBER AND INTERNET AGREEMENT**

N/A -
_____
(Name of Telephone Company)

N/A -
_____
(Address)

N/A -
_____
(City, State, Zip)

This TELEPHONE NUMBER AND INTERNET AGREEMENT, ASSIGNMENT AND POWER OF ATTORNEY ("Assignment") is made pursuant to the terms of the Franchise Agreement dated ___December 10, 2020___("Agreement") by and between Mister Sparky Franchising, L.L.C. ("Franchisor") and Daniel Ferguson ("Franchisee"), authorizing Franchisee to use Franchisor's Marks and System in the operation of a business (the "Franchised Business") in and for the Territory. Capitalized terms used herein without a definition shall have the meaning assigned to them in the Agreement.

For value received, Franchisee hereby irrevocably assigns to Franchisor all telephone listings and numbers at any time used by Franchisee in any printed or internet telephone directory in connection with the operation of the Franchised Business, whether now-existing or adopted by Franchisee in the future (collectively "Telephone Listings") and all email addresses, domain names, social media accounts and comparable electronic identities that use the Marks or any portion of them at any time used by Franchisee in connection with any Internet directory, website or similar item in connection with the operation of the Franchised Business, whether now-existing or adopted by Franchisee in the future (collectively "Internet Listings") (collectively referred to herein as "Listings"). From time to time upon Franchisor's request, Franchisee agrees to promptly provide a complete list of all Listings to Franchisor (in such format and level of detail as required by Franchisor).

Franchisee shall have the right to use the Listings only in connection with advertising the Franchised Business in the Territory. Franchisee agrees to pay all amounts pertaining to the use of the Listings incurred by it when due. Upon expiration or termination of the Agreement for any reason, Franchisee's right of use of the Listings shall terminate. In the event of termination or expiration of the Agreement, Franchisee agrees to pay all amounts owed in connection with the Listings, including all sums owed under existing contracts for telephone directory advertising and to immediately, at Franchisor's request, (i) take any other action as may be necessary to transfer the Listings and numbers to Franchisor or Franchisor's designated agent, (ii) install and maintain, at Franchisee's sole expense, an intercept message, in a form and manner acceptable to Franchisor, on any or all of the Listings; (iii) disconnect the Listings; and/or (iv) cooperate with Franchisor or its designated agent in the removal or relisting of any telephone directory or directory assistance listing, Internet directory, website or advertising, whether published or online.

Franchisee agrees that Franchisor may require that all telephone numbers and telephone and internet equipment and service must be owned or provided by Franchisor or a supplier approved by Franchisor and that Franchisor has the right to require Franchisee to "port" or transfer to Franchisor or an approved call routing and tracking vendor all phone numbers associated with the Franchised Business or published in any print or online directory, advertisement, marketing or promotion associated with the Marks.

Franchisee appoints Franchisor as Franchisee's attorney-in-fact, to act in Franchisee's place, for the purpose of assigning any Listings to Franchisor or Franchisor's designated agent or taking any other actions required of Franchisee under this Assignment. Franchisee grants Franchisor full authority to act in any manner proper or necessary to the exercise of the foregoing powers, including full power of substitution and execution or completion of any documents required or requested by any telephone or other company to transfer such Listings, and Franchisee ratifies every act that Franchisor may lawfully perform in exercising those powers. This power of attorney shall be effective for a period of two (2) years from the date of expiration, cancellation or termination of Franchisee's rights under the Agreement for any reason. Franchisee intends that this power of attorney be coupled with an interest. Franchisee declares this power of attorney to be irrevocable and renounces all rights to revoke it or to appoint another person to perform the acts referred to in this instrument. This power of attorney shall not be affected by the subsequent incapacity of Franchisee. This power of attorney is created to secure performance of a duty to Franchisor and is for consideration.

FRANCHISEE:

DocuSigned by:

*Daniel Ferguson*

D359EBEF4A3441A...

Daniel Ferguson, individually

December 10, 2020

Date

**APPENDIX E TO FRANCHISE AGREEMENT**

**ELECTRONIC FUND TRANSFER AUTHORIZATION FORM**

Payee: Mister Sparky Franchising, L.L.C.  ("Franchisor")

981237068
_____
Account Number

122400779
_____
ABA Routing #

Nevada State Bank
_____
Bank Name (Please Print)

PO Box 990 Las Vegas NV 89113
_____
Address

The undersigned hereby authorizes Franchisor to initiate debit entries by either electronic or paper means to the undersigned's account indicated above at the Bank indicated above (the "Bank"), and authorizes the Bank to debit the same to such account and to make payment to Franchisor, or its assigns, at 7120 Samuel Morse Drive, Suite 300, Columbia, MD 21046, or such other address as may be designated by Franchisor. The undersigned agrees that in making payment for such charges, the Bank's rights shall be the same as if each were a charge made and signed personally by the undersigned. The Bank shall have no obligation regarding the calculation or verification of the amount of any such payments.

This authority shall remain in full force and effect until Franchisor and the Bank have received a minimum of ninety (90) days' advance written notice from the undersigned of the termination of authority granted herein. Until the Bank actually receives such notice, the undersigned agrees that the Bank shall be fully protected in paying any amounts pursuant to this authority. The undersigned further agrees that if any such payments are not made, whether with or without cause, and whether intentionally or inadvertently, the Bank shall be under no liability whatsoever to the undersigned.

Daniel Ferguson
_____
Printed Name of Franchisee (Individual or Business Entity)

_Daniel Ferguson_
_____
Signature of Franchisee (and Title, if signing on behalf of a Business Entity)

Date Signed: December 10, 2020
_____

Mister Sparky - Franchise Agreement                                     May 2020
MS0234 – Daniel Ferguson

# PROMISSORY NOTE

Principal Amount: **$26,694.61**

Effective Date: December 10, 2020

1.       **Principal Amount.** For value received, the undersigned ("Maker") hereby unconditionally promises to pay to the order of Mister Sparky Franchising, L.L.C., a Florida limited liability company with its principal offices located at 7120 Samuel Morse Drive, Suite 300, Columbia, Maryland 21046 ("Holder"), in lawful money of the United States of America, the Principal Amount of **Twenty Six Thousand Six Hundred Ninety-Four and 61/100 Dollars ($26,694.61)** together with interest as set forth in Section 2.C. The Principal Amount represents a portion the Franchise Fee owed to Holder in connection with a Mister Sparky Franchising, L.L.C. Franchise Agreement dated as of December 10, 2020 ("Franchise Agreement").

2.       **Payment Related Terms.**

A.       **Payment.** Maker shall pay the Principal and Interest Amount to Holder in thirty-six (36) equal monthly installments due as designated by Holder each month in the amount of **Eight Hundred Eighty Six and 64/100 Dollars ($886.64)** commencing on **May 1, 2021** and with the final payment in the amount of **Eight Hundred Eighty Six and 64/100 Dollars ($886.64)** due on **April 1, 2024**. The attached amortization schedule reflects the payment schedule and is incorporated into this Note.

B.       **Payment Arrangements.** Unless otherwise designated in writing by Holder, the payment required by Section 2.A. shall be made to Holder by electronic funds transfer in accordance with the terms of the Electronic Funds Transfer Agreement attached to the Franchise Agreement as an appendix.  Maker shall be responsible for all costs and expenses incurred by Maker and Holder in connection with the electronic funds transfer.

C.       **Interest**

(i)       Interest at a rate of 12% per annum shall begin to accrue on the outstanding amounts due as of the above Effective Date. Interest shall be calculated on the basis of a year of three hundred and sixty-five (365) days and charged for the actual number of days elapsed. Interest on the indebtedness evidenced by this Note shall in no event exceed the maximum amount permissible under applicable law ("Maximum Rate").

(ii)       After the occurrence of a Default, this Note shall bear interest, payable on demand, at a rate equal to 18% per annum, until paid, but not to exceed the Maximum Rate whether before or after the entry of judgment hereon. Interest shall be calculated on the basis of a year of 365 days and charged for the actual number of days elapsed. Following a permitted cure or waiver of Default, this Note shall cease to bear interest under this section C(ii) and resume interest under section C(i) above. This provision does not constitute a waiver of any Default or an agreement by the Holder to permit any late payments.

1

**(iii)** If, at any time, the interest to be paid by Maker would exceed the Maximum Rate, the interest to be paid shall be reduced to the Maximum Rate, and Holder shall credit any payment in excess of the Maximum Rate to the Principal Amount or refund the excess to Maker. The terms and provisions of this paragraph shall control and supersede every other conflicting provision of this Note.

D. **Prepayment.** This Note may be prepaid at the option of Maker, in whole or in part, without penalty.

3. **Assignment.** This Note is personal to Maker and is not assignable by Maker. This Note is assignable by Holder without notice to or consent of Maker.

4. **Default.**

A. Any of the following events shall constitute an event of default ("Default"):

(i) Maker fails to pay any principal of or, if applicable, interest on this Note when the same shall become due, either by the terms hereof or by acceleration or otherwise; or

(ii) Maker or its affiliates or subsidiaries default on any agreement with Holder, or its affiliates or subsidiaries, including the Franchise Agreement.

B. Upon the occurrence of any Default, Holder may, at its option and in addition to any right, power or remedy permitted by law or equity, by written notice to Maker, declare the unpaid Principal Amount of this Note to be and the same shall thereupon be and become, forthwith due and payable in its entirety, together with, if applicable, accrued interest on that amount. A Default under this Note shall also constitute a Default under the Franchise Agreement. No waiver by Holder of any Default shall operate as a waiver of any other default or the same default on a future occasion.

5. **Waivers.** Maker hereby waives presentment and demand for payment, notice of non-payment, notice of dishonor, protest of dishonor, and notice of protest. All sums due under this Note shall be without relief from valuation and appraisement laws.

6. **Notices.** No notice, demand, request or other communication to Maker or Holder shall be binding unless the notice is in writing and pursuant to section 21 of the Franchise Agreement.

7. **Enforcement.**

A. **Choice of Law.** This Note shall be governed by and construed in accordance with the laws of the State of Maryland.

B. **Choice of Forum.** Maker hereby submits to the personal jurisdiction of the state and federal courts located in Maryland, consents to venue in those courts, and agrees that Holder may, at Holder's option, enforce its rights under this Note in those courts.

C. **Reimbursement of Costs.** If Holder brings an action to enforce or collect this Note, the prevailing party in such proceeding shall be entitled to reimbursement of its costs and expenses,

2

including, but not limited to, reasonable accountants', attorneys', attorneys' assistants' and expert witnesses' fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for, in contemplation of, or subsequent to the filing of, any such proceeding. In any judicial proceeding, these costs and expenses shall be determined by the court and not by a jury. If Holder utilizes legal counsel (including in-house counsel employed by Holder or its affiliates) in connection with any failure by the undersigned to comply with this Note, Maker shall reimburse Holder for any of the above-listed costs and expenses incurred by it.

D.    **Miscellaneous.** Maker acknowledges that its obligations under this Note are unconditional and separate from and independent of any other representations, warranties, commitments, agreements or understandings, whether oral or written, express or implied, between Maker and Holder. The liability of each entity or individual who is included as the "Maker" shall be joint and several.

E.    **Severability**. If, but only to the extent that, any provision of this Note shall be invalid or unenforceable, then, such offending provision shall be deleted from this Note, but only to the extent necessary to preserve the validity and effectiveness of this Note to the fullest extent permitted by applicable law.

F.    **Writing Required**. ORAL AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FOREBEAR FROM ENFORCING REPAYMENT OF A DEBT, INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT, ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

G.    **Jury Trial Waiver. Maker waives, to the fullest extent permitted by applicable law, the right to a trial by jury in any action arising out of or relating to this Note or any Default under this Note.**

**IN WITNESS WHEREOF**, Maker has executed this Note as of the date below.

**MAKER:**

DocuSigned by:

*Daniel Ferguson*

D359EBEF4A3441A...

Print Name: Daniel Ferguson

Date: December 10, 2020

3

DocuSign Envelope ID: 0F1E83B7-5506-48C1-B5F0-3E7503692416

# AMORTIZATION SCHEDULE
## TO PROMISSORY NOTE

| No. | Date | Payment | Balance | Monthly Finance | Principle Applied | Payoff |
|---|---|---|---|---|---|---|
| 1 | 5/1/2021 | $886.64 | $26,074.91 | $266.95 | $619.70 | $26,341.86 |
| 2 | 6/1/2021 | $886.64 | $25,449.02 | $260.75 | $625.89 | $25,709.77 |
| 3 | 7/1/2021 | $886.64 | $24,816.86 | $254.49 | $632.15 | $25,071.35 |
| 4 | 8/1/2021 | $886.64 | $24,178.39 | $248.17 | $638.47 | $24,426.56 |
| 5 | 9/1/2021 | $886.64 | $23,533.53 | $241.78 | $644.86 | $23,775.31 |
| 6 | 10/1/2021 | $886.64 | $22,882.22 | $235.34 | $651.31 | $23,117.56 |
| 7 | 11/1/2021 | $886.64 | $22,224.40 | $228.82 | $657.82 | $22,453.22 |
| 8 | 12/1/2021 | $886.64 | $21,560.00 | $222.24 | $664.40 | $21,782.25 |
| 9 | 1/1/2022 | $886.64 | $20,888.96 | $215.60 | $671.04 | $21,104.56 |
| 10 | 2/1/2022 | $886.64 | $20,211.21 | $208.89 | $677.75 | $20,420.10 |
| 11 | 3/1/2022 | $886.64 | $19,526.68 | $202.11 | $684.53 | $19,728.79 |
| 12 | 4/1/2022 | $886.64 | $18,835.30 | $195.27 | $691.38 | $19,030.57 |
| 13 | 5/1/2022 | $886.64 | $18,137.01 | $188.35 | $698.29 | $18,325.36 |
| 14 | 6/1/2022 | $886.64 | $17,431.74 | $181.37 | $705.27 | $17,613.11 |
| 15 | 7/1/2022 | $886.64 | $16,719.41 | $174.32 | $712.33 | $16,893.73 |
| 16 | 8/1/2022 | $886.64 | $15,999.96 | $167.19 | $719.45 | $16,167.16 |
| 17 | 9/1/2022 | $886.64 | $15,273.32 | $160.00 | $726.64 | $15,433.32 |
| 18 | 10/1/2022 | $886.64 | $14,539.41 | $152.73 | $733.91 | $14,692.14 |
| 19 | 11/1/2022 | $886.64 | $13,798.16 | $145.39 | $741.25 | $13,943.55 |
| 20 | 12/1/2022 | $886.64 | $13,049.50 | $137.98 | $748.66 | $13,187.48 |
| 21 | 1/1/2023 | $886.64 | $12,293.35 | $130.49 | $756.15 | $12,423.85 |
| 22 | 2/1/2023 | $886.64 | $11,529.64 | $122.93 | $763.71 | $11,652.58 |
| 23 | 3/1/2023 | $886.64 | $10,758.30 | $115.30 | $771.35 | $10,873.59 |
| 24 | 4/1/2023 | $886.64 | $9,979.24 | $107.58 | $779.06 | $10,086.82 |
| 25 | 5/1/2023 | $886.64 | $9,192.38 | $99.79 | $786.85 | $9,292.18 |
| 26 | 6/1/2023 | $886.64 | $8,397.67 | $91.92 | $794.72 | $8,489.59 |
| 27 | 7/1/2023 | $886.64 | $7,595.00 | $83.98 | $802.67 | $7,678.98 |
| 28 | 8/1/2023 | $886.64 | $6,784.31 | $75.95 | $810.69 | $6,860.26 |
| 29 | 9/1/2023 | $886.64 | $5,965.51 | $67.84 | $818.80 | $6,033.35 |
| 30 | 10/1/2023 | $886.64 | $5,138.52 | $59.66 | $826.99 | $5,198.17 |
| 31 | 11/1/2023 | $886.64 | $4,303.26 | $51.39 | $835.26 | $4,354.65 |
| 32 | 12/1/2023 | $886.64 | $3,459.65 | $43.03 | $843.61 | $3,502.68 |
| 33 | 1/1/2024 | $886.64 | $2,607.60 | $34.60 | $852.05 | $2,642.20 |
| 34 | 2/1/2024 | $886.64 | $1,747.04 | $26.08 | $860.57 | $1,773.11 |
| 35 | 3/1/2024 | $886.64 | $877.86 | $17.47 | $869.17 | $895.33 |
| 36 | 4/1/2024 | $886.64 | $0.00 | $8.78 | $877.86 | $8.78 |

4

Mister Sparky - Promissory Note, Guaranty and Security Agreement
MS0234 – Daniel Ferguson

May 2020

EX. A - 69

## GUARANTEE

In consideration of the willingness of Mister Sparky Franchising, L.L.C. ("Holder") to permit Daniel Ferguson ("Maker") to pay a portion of the Franchise Fee owed to Holder in connection with a Mister Sparky Franchising, L.L.C. Franchise Agreement and pursuant to the foregoing Promissory Note ("Note"), the undersigned_("Guarantors"), hereby personally and unconditionally: **(1)** guarantee to Holder and its successors and assigns that Maker shall punctually pay and perform each and every undertaking set forth in the Note; and **(2)** agree personally to be liable for Maker's Default under the Note.

Each Guarantor waives: **(a)** acceptance and notice of acceptance by Holder of the foregoing undertakings; **(b)** notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; **(c)** protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; **(d)** any right he or she may have to require that an action be brought against Maker or any other person as a condition of liability; **(e)** all rights to payments and claims for reimbursement or subrogation which any Guarantor may have against Maker arising as a result of the execution of and performance under this Guarantee by any Guarantor; **(f)** any law or statute which requires that Holder make demand upon, assert claims against or collect from Maker or any others, foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Maker or any others prior to making any demand upon, collecting from or taking any action against Guarantors with respect to this Guarantee; **(g)** any and all other notices and legal or equitable defenses to which he or she may be entitled; and **(h)** any and all right to have any legal action under this Guarantee decided by a jury.

Each Guarantor consents and agrees that: **(i)** his or her direct and immediate liability under this Guarantee shall be joint and several; **(ii)** he or she shall render any payment or performance required under the Note upon demand if Maker fails or refuses punctually to do so; **(iii)** such liability shall not be contingent or conditioned upon pursuit by Holder of any remedies against Maker or any other person; **(iv)** such liability shall not be diminished, relieved or otherwise affected by any amendment of the Note, any extension of time, credit or other indulgence which Holder may from time to time grant to Maker or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this Guarantee, which shall be continuing and irrevocable during the term of the Note and for so long thereafter as there are monies or obligations owing from Maker to Holder under the Note; and **(v)** monies received from any source by Holder for application toward payment of the obligations under the Note and under this Guarantee may be applied in any manner or order deemed appropriate by Holder.

If any of the following events occur, a default ("Default") under this Guarantee shall exist: **(a)** failure of timely payment or performance of the obligations under this Guarantee; **(b)** breach of any agreement or representation contained or referred to in this Guarantee; **(c)** the appointment of a guardian for, appointment of a receiver for, assignment for the benefit of creditors of, or the commencement of any insolvency or bankruptcy proceeding by or against, any Guarantor; and/or **(d)** the entry of any monetary judgment or the assessment against, the filing of any tax lien against, or the issuance of any writ of garnishment or attachment against any property of or debts due any

Guarantor. If a Default occurs, the obligations of Guarantors shall be due immediately and payable without notice.

All notices, requests and approvals under this Guarantee shall be in writing and shall be deemed to have been properly given if and when personally delivered, or five (5) days after being sent by certified or registered mail, postage prepaid, return receipt requested, or thirty-six (36) hours after being sent by Federal Express or other overnight courier service providing delivery confirmation, to the address of the party set forth below or at such other address as any of the parties hereto from time to time may have designated by written notice to the other party.

**IF TO GUARANTORS:**    Daniel Ferguson
43 Avenida Arenas
Henderson, NV 89074

**IF TO HOLDER**:    Mister Sparky Franchising, L.L.C.
7120 Samuel Morse Drive, Suite 300
Columbia, Maryland 21046

This Guarantee shall be governed by and construed in accordance with the laws of the State of Maryland. Each Guarantor hereby submits to the personal jurisdiction of the state and federal courts located in Maryland, consents to venue in those courts, and agrees that Holder may, at Holder's option, enforce its rights under this Guarantee in those courts. **Each Guarantor waives, to the fullest extent permitted by applicable law, the right to a trial by jury in any action arising out of or relating to this Guarantee or any Default under this Guarantee.**

If Holder brings an action to enforce this Guarantee in a judicial proceeding, the prevailing party in such proceeding shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants' and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for or in contemplation of the filing of any such proceeding. In any judicial proceeding, these costs and expenses shall be determined by the court and not by a jury.

If Holder utilizes legal counsel (including in-house counsel employed by Holder or its affiliates) in connection with any failure by Guarantors to comply with this Guarantee, Guarantors shall reimburse Holder for any of the above-listed costs and expenses incurred by it.

This Guarantee is personal to the undersigned and is not assignable by Guarantors. This Guarantee is assignable by Holder.

If signed by more than one person or entity, the obligations hereunder shall be joint and several as to each signatory.

Guarantors acknowledge that their obligations under this Guarantee are unconditional and are separate from and independent of any other representations, warranties, commitments, agreements or understandings, whether oral or written, express or implied, between Guarantors

and Holder, and that this Guarantee contains the entire agreement of Guarantors and Holder with respect to the subject matter of this Guarantee.

IN WITNESS WHEREOF, each of the undersigned has executed this Guarantee as of the date first above written:

GUARANTORS:

By: *Daniel Ferguson*
D359EBEF4A3441A...

Print Name: Daniel Ferguson

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** ("Agreement") is made and entered into as of ___12/10/2020_____, 2020, by and between Daniel Ferguson, a Nevada resident ("Debtor"), and Mister Sparky Franchising, L.L.C., a Florida limited liability company ("Secured Party"), who agree as follows:

1.      **Recitals**. This Agreement is made and entered into with reference to the following facts and circumstances:

      A.      Debtor and Secured Party entered into a Mister Sparky Franchising, L.L.C. Franchise Agreement ("Franchise Agreement") under which Debtor was required to pay Secured Party a "Franchise Fee";

      B.      Debtor and Secured Party entered into a Promissory Note ("Note") on the same date as this Security Agreement ("Agreement") under which Secured Party agreed to permit Debtor to pay a portion of the Franchise Fee on a payment plan;

      C.      Debtor is jointly and severally indebted to Secured Party in the principal amount of **$26,694.61** as evidenced by the Note (the "Indebtedness"); and

      D.      As a material inducement for Secured Party's accepting the Note, Debtor has agreed to secure Debtor's performance under the provisions and conditions of the Note, the Franchise Agreement, and any other debts Debtor owes to Secured Party by granting to Secured Party a security interest in the collateral described in this Agreement.

2.      **Grant of Security Interest**. As security for: (i) Debtor's timely and complete payment of all amounts owing under the Note, the Franchise Agreement, and of any other debts Debtor owes to Secured Party; and (ii) Debtor's performance of all of the covenants, obligations and agreements contained in the Note, the Franchise Agreement, this Agreement and all other instruments and documents pertaining to, evidencing or securing the Note, the Franchise Agreement or other debts Debtor owes to Secured Party (and as those instruments and documents may be amended from time to time), Debtor hereby grants, transfers, and assigns to Secured Party a continuing security interest in the following items, property and rights (collectively, "Collateral"):

      A.      All of the personal property of Debtor now and hereafter situated at, used in connection with, relating to or deriving from any Mister Sparky business (or its successor) pursuant to the Franchise Agreement or otherwise, including without limitation, at those certain premises which are described on Exhibit A, attached hereto and incorporated herein by this reference ("Premises"), and the businesses conducted at such Premises, including, without limitation, all present and after-acquired goods, accounts, documents, instruments, money, deposit accounts, chattel paper, inventory, equipment, supporting obligations, investment property, letter of credit rights, and general intangibles; and

      B.      Debtor's entire right, title and interest in and to all replacements, rents, profits, substitutions and (or) additions to or of those items referred to in subparagraph 2.A. above, and any proceeds arising from the sale and(or) other disposition of the same (including, without limitation, sums payable for loss under insurance covering the Collateral).

3.      **Warranties; Protection of Collateral**. Debtor warrants that it is the owner of the Collateral free of all liens except the lien created hereby. Debtor agrees that it: (a) will properly maintain, repair and preserve the Collateral and insure the same against casualty loss by a policy of insurance covering such

Mister Sparky - Promissory Note, Guaranty and Security Agreement                                        May 2020
MS0234 – Daniel Ferguson

risks and in such amount as the Secured Party may require, with loss payable to Secured Party and will furnish certificates acceptable to Secured Party; (b) will pay in timely fashion all taxes which may become a lien on the Collateral; (c) except with Secured Party's prior written consent, Debtor will make no sale, contract to sell, lease, encumbrance or other disposition of the Collateral nor change its physical location from the Premises above designated; (d) will use the Collateral lawfully and only within insurance coverage and not use the Collateral so as to cause or result in any waste, unreasonable deterioration or depreciation; (e) will permit Secured Party to enter on Debtor's property and to inspect the Collateral at any reasonable time; (f) will not, with the exception of sales of inventory in the ordinary course of business, remove the Collateral from the Premises without the consent of Secured Party except when reasonably necessary for repair or to replace obsolete or worn out items of Collateral; and (g) will execute any additional agreements, assignments or documents that may be deemed necessary or advisable by Secured Party to effectuate the purpose of this Agreement and the protection of the Collateral.

4. **Delivery and Perfection**. Debtor agrees to execute and deliver to Secured Party any other documents reasonably requested by Secured Party to create, maintain, perfect, or assure the priority of the security interest granted above. Debtor hereby appoints Secured Party as its agent and attorney-in-fact to execute and deliver documents and to take all other actions (to the extent permitted by law) in Debtor's name and on Debtor's behalf that Secured Party may deem necessary or advisable to create, maintain, perfect, assure the priority of, or foreclose its security interest in and lien on the Collateral. This appointment is coupled with an interest and is irrevocable as long as any of the Indebtedness remains outstanding.

5. **Default**. The following shall constitute a default by Debtor hereunder:

A. Any failure to comply with the provisions of the Franchise Agreement, this Agreement, or any other agreement with Secured Party, or to perform any covenant contained herein.

B. Any default by Debtor under the Note or any failure to pay when due any portion of the Indebtedness, including, without limitation, any interest payable thereunder.

C. Any loss, theft, substantial damage or destruction of the Collateral or issuance of attachment, levy, garnishment or judicial process with respect to the Collateral.

D. Insolvency, bankruptcy, business failure, assignment for benefit of creditors or appointment of a receiver for Debtor or its property.

E. Secured Party deeming itself insecure, believing in good faith that the prospect of payment of the Indebtedness (or any portion thereof) or of performance of this Agreement, or any covenant contained herein, is impaired.

6. **Rights and Remedies**. In the event of a default hereunder, Secured Party shall have and shall otherwise be entitled to all rights and remedies provided for or allowed under law. In accordance with the foregoing, and without limitation, Secured Party shall be entitled to:

A. Take possession of and protect the Collateral, including the right to remove all persons from the Premises and take sole possession thereof.

B. If Secured Party is not then in possession of the Collateral, to require Debtor or any other person in possession of the Collateral to assemble it at Debtor's expenses and make it available to Secured Party at a reasonably convenient place, to be designated by Secured Party.

C. Retain the Collateral in satisfaction of Debtor's obligations, or dispose of the Collateral by

9

public or private sale (at which sale the Secured Party may be a buyer), or commence operation of the Business for Debtor's account. Any sale or operation of the Business shall be deemed to be on Debtor's account unless Secured Party gives Debtor written notice of intent to retain the Collateral in satisfaction of Debtor's obligations. The proceeds of sale or operation for Debtor's account shall be applied in total or partial satisfaction of Debtor's obligations to Secured Party and for Secured Party's costs incurred in proceeding under this paragraph.  All proceeds shall be applied first to cover Secured Party's costs, and second to satisfy Debtor's obligations to Secured Party.  To the extent there is still any deficiency in the amount Secured Party is owed, Secured Party may collect the same from Debtor, and, to the extent that any excess proceeds exist (after the application of such proceeds as provided for herein and under the law), Secured Party shall pay the same to Debtor.

D.      Declare any and all amounts outstanding under the Note to be immediately due and payable.

E.      Reduce any claim against Debtor to judgment and enforce any such judgment against Debtor.

F.      Take such steps as it may deem appropriate to foreclose upon or otherwise enforce the security interest(s) and lien of this Agreement to secure payment and performance of the Debtor's obligations under this Agreement and the Note.

G.      Exercise any and all other rights and remedies available at law or equity or otherwise to Secured Party under this Agreement or the Note.

7.      **Nonwaiver**. No delay or omission to exercise any right, power, or remedy accruing to Secured Party upon any breach or default of Debtor under this Agreement shall impair any such right, power, or remedy of Secured Party, nor shall it be construed to be a waiver of any such breach thereafter occurring, nor shall any waiver of any single breach or default theretofore occurring be deemed a waiver of any other breach or default. Any waiver, permit, consent, or approval of any kind under this Agreement, or any waiver on the part of the Secured Party of any provision or condition of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law, or otherwise afforded to Secured Party, shall be cumulative and not alternative.

8.      **Notices**. Unless otherwise specifically provided in this Agreement, all notices, demands, or other communications given hereunder will be in writing and pursuant to section 21 of the Franchise Agreement.

9.      **Miscellaneous**.

A.      This Agreement has been negotiated at arm's length and between persons sophisticated and knowledgeable in the manners dealt with in this Agreement. In addition each party has had the opportunity to consult with experienced and knowledgeable legal counsel.  Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purpose of the parties and this Agreement.

B.      In the event of any dispute arising out of this Agreement, or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses incurred in any action, arbitration, mediation, or litigation, including without limitation court costs and reasonable attorneys' fees and disbursements.

C.      Any provisions of this Agreement which may be prohibited by law or otherwise held

Mister Sparky - Promissory Note, Guaranty and Security Agreement                                      May 2020
MS0234 – Daniel Ferguson

EX. A - 75

invalid shall be ineffective only to the extent of such prohibition or invalidity and shall not invalidate or otherwise render ineffective the remaining provisions of this Agreement.

       D.       This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland. Sole and proper venue for any action shall be in the state and federal courts in Maryland.

       E.       This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

DEBTOR:

DocuSigned by:

By: _Daniel Ferguson_____

    Daniel Ferguson

Its: _Owner_____

Mister Sparky - Promissory Note, Guaranty and Security Agreement          May 2020
MS0234 – Daniel Ferguson

EX. A - 76

DocuSign Envelope ID: 0F1E8BB7-5506-48C1-B5F0-3E750B692416

## EXHIBIT A TO SECURITY AGREEMENT

Premises: Any location where Franchisee operates a Mister Sparky business.

Mister Sparky - Promissory Note, Guaranty and Security Agreement                    May 2020
MS0234 – Daniel Ferguson

EX. A - 77

# QUESTIONNAIRE

You are about to enter into a Franchise Agreement with Mister Sparky Franchising, L.L.C. ("**we**," "**us**," or "**our**"). The purpose of this Questionnaire is to confirm that you understand the terms of the agreement and that no unauthorized statements or promises have been made to you. Please review each of the following questions and statements carefully and provide honest and complete responses to each.

Note:   If you are purchasing an existing franchise from an existing franchisee, you may have received information from the transferring franchisee, who is not our employee or representative. The questions below do not apply to any communications that you had with the transferring franchisee.

1.      Did you receive and give us a signed Receipt for our Franchise Disclosure Document dated May 21, 2020 (the "**FDD**")?   ___x___ Yes   _____ No

2.      Has any person representing our company (either an employee or an outside person) given you information that is inconsistent with the information in the FDD concerning the investment necessary to start a Mister Sparky franchise? If the answer is "yes," please (a) identify the person, and (b) describe the information you received from that person in detail below. If the answer is "no," please write "NONE" below:

no
_____
          None
_____

_____

3.      Has any person representing our company given you information that is inconsistent with the information in the FDD concerning the financial performance of Mister Sparky franchises? If the answer is "yes," please (a) identify the person, and (b) describe the information you received from that person in detail below. If the answer is "no," please write "NONE" below:

no
_____
          None
_____

_____

4.      Has any person representing our company given you any other information that is inconsistent with the FDD and is influencing your decision to sign the Franchise Agreement? If the answer is "yes," please (a) identify the person, and (b) describe the nature of that information in detail below. If the answer is "no," please write "NONE" below:

no
_____
          None
_____

_____

*        *        *

1

Mister Sparky – Questionnaire                                                                  May 2020
MS0234 – Daniel Ferguson

Please understand that your responses to these questions are important to us and that we will rely on them. By signing this Questionnaire, you are representing that you have responded truthfully to the above questions.

**FRANCHISE APPLICANT**

By: _Daniel Ferguson_

D359EBEF4A3441A...

Name: _Daniel Ferguson_

Date: _December 10, 2020_

2

Mister Sparky – Questionnaire                                          May 2020
MS0234 – Daniel Ferguson

EX. A - 79

7220 South Cimarron Road Suite 140
Las Vegas, NV 89113

DATE _____

AY
N THE
DER OF _____

NEVADA STATE BANK

⑈00000078⑈ ⑆122400779⑆ 981237068⑈



EX. A - 80



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 0F1E8BB7550C48C1B5F93E750B693416 | | Status: Completed |
| Subject: MS0234 - Franchise Agreement - Daniel Ferguson | | |
| Source Envelope: | | |
| Document Pages: 80 | Signatures: 13 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 1 | Jaime Snyder |
| AutoNav: Enabled | | 7120 Samuel Morse Drive |
| EnvelopeId Stamping: Enabled | | Suite 300 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Columbia, MD  21046 |
| | | jsnyder@authoritybrandsllc.com |
| | | IP Address: 69.251.239.8 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Jaime Snyder | Location: DocuSign |
| 12/10/2020 6:04:48 AM | jsnyder@authoritybrandsllc.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Daniel Ferguson<br>fdaniel314@aol.com<br>Owner<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>*Daniel Ferguson*<br>D359EBEF4A3441A...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 98.181.131.155 | Sent: 12/10/2020 6:49:55 AM<br>Viewed: 12/10/2020 7:47:45 AM<br>Signed: 12/10/2020 8:31:10 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 12/10/2020 7:47:45 AM<br>ID: 1591cf91-d2a6-4da1-8458-9b3681fb8d47 | | |
| Jaime Snyder<br>jsnyder@authoritybrandsllc.com<br>Parlegal<br>Authority Brands, LLC<br>Security Level: Email, Account Authentication (None) | **Completed**<br><br>Using IP Address: 174.237.8.96<br>Signed using mobile | Sent: 12/10/2020 8:31:18 AM<br>Viewed: 12/10/2020 9:15:18 AM<br>Signed: 12/10/2020 9:20:43 AM<br>Freeform Signing |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Mark Dawson<br>MarkDawson@authoritybrands.co<br>COO<br>Security Level: Email, Account Authentication (None) | **DocuSigned by:**<br>*Mark Dawson*<br>453AD1CC6F194E5...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 70.186.39.82 | Sent: 12/10/2020 9:20:52 AM<br>Viewed: 12/10/2020 9:21:40 AM<br>Signed: 12/10/2020 9:22:07 AM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 12/10/2020 9:21:40 AM<br>ID: b68fbd39-4990-4575-aebe-2104ec57c277 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

EX. A - 81

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Lani Binnie<br>lbinnie@authoritybrandsllc.com<br>Authority Brands, LLC<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 12/10/2020 6:49:54 AM |
| Christina Rodgers<br>crodgers@thecleaningauthority.com<br>Development Manager<br>The Cleaning Authority<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 12/10/2020 6:49:54 AM<br>Viewed: 12/10/2020 7:52:07 AM |
| Lance Sinclair<br>Lance.Sinclair@authoritybrands.co<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 12/10/2020 6:49:54 AM |
| Jared Klepko<br>jklepko@authoritybrandsllc.com<br>Sr. Director, Franchise Development<br>Authority Brands<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Accepted: 11/15/2020 6:22:41 AM<br>ID: 59669772-f5ca-445f-bc34-984a054a7927 | **COPIED** | Sent: 12/10/2020 6:49:55 AM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/10/2020 6:49:54 AM |
| Certified Delivered | Security Checked | 12/10/2020 9:21:40 AM |
| Signing Complete | Security Checked | 12/10/2020 9:22:07 AM |
| Completed | Security Checked | 12/10/2020 9:22:07 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

EX. A - 82

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Authority Brands, LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

EX. A - 83

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Authority Brands, LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ngreene@authoritybrandsllc.com

**To advise Authority Brands, LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ngreene@authoritybrandsllc.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Authority Brands, LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ngreene@authoritybrandsllc.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Authority Brands, LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

EX. A - 84

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ngreene@authoritybrandsllc.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Authority Brands, LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Authority Brands, LLC during the course of your relationship with Authority Brands, LLC.

EX. A - 85